Civil Action Cover Sheet - Case Initiation                                    (Rev. 2/8/06) CCL 0520

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

Wachovia Bank, National Association, Plaintiff

v.

Majapara Casa de Cambio S.A. de C.V., Defendant

Harris N.A., Garnishee

No.

```
2007L013958
CALENDAR/ROOM T
TIME 00:00
Other Com Litigation
```

## CIVIL ACTION COVER SHEET - CASE INITITATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. ONLY ONE (1) CASE TYPE MAY BE CHECKED WITH THIS COVER SHEET.

(FILE STAMP)

Jury Demand  ☐ Yes  ☒ No

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027  Motor Vehicle
- ☐ 040  Medical Malpractice
- ☐ 047  Asbestos
- ☐ 048  Dram Shop
- ☐ 049  Product Liability
- ☐ 051  Construction Injuries
  (including Structural Work Act, Road
  Construction Injuries Act and negligence)
- ☐ 052  Railroad/FELA
- ☐ 053  Pediatric Lead Exposure
- ☐ 061  Other Personal Injury/Wrongful Death
- ☐ 063  Intentional Tort
- ☐ 064  Miscellaneous Statutory Action
  *(Please Specify Below**)*
- ☐ 065  Premises Liability
- ☐ 078  Fen-phen/Redux Litigation
- ☐ 199  Silicone Implant

### COMMERCIAL LITIGATION
CASE TYPES:
- ☐ 002  Breach of Contract
- ☐ 070  Professional Malpractice
  (other than legal or medical)
- ☐ 071  Fraud
- ☐ 072  Consumer Fraud
- ☐ 073  Breach of Warranty
- ☐ 074  Statutory Action
  *(Please Specify Below**)*
- ☒ 075  Other Commercial Litigation
  *(Please Specify Below**)*
- ☐ 076  Retaliatory Discharge

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007  Confession of Judgment
- ☐ 008  Replevin
- ☐ 009  Tax
- ☐ 015  Condemnation
- ☐ 017  Detinue
- ☐ 029  Unemployment Compensation
- ☐ 036  Administrative Review Action
- ☐ 085  Petition to Register Foreign Judgment
- ☐ 099  All Other Extraordinary Remedies

### OTHER ACTIONS
CASE TYPES:
- ☐ 062  Property Damage
- ☐ 066  Legal Malpractice
- ☐ 077  Libel/Slander
- ☐ 079  Petition for Qualified Orders
- ☐ 084  Petition to Issue Subpoena
- ☐ 100  Petition for Discovery

** Issuance of Order for Attachment and Other Relief

By: _____
(Attorney)                    (Pro Se)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**08 C 170**

**JUDGE ST. EVE
MAGISTRATE JUDGE COLE**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| WACHOVIA BANK,<br>NATIONAL ASSOCIATION, | ) ) ) | |
| *Plaintiff,* | ) ) | Case No. |
| v. | ) ) | |
| MAJAPARA CASA DE CAMBIO S.A. de C.V.,<br>a Mexican corporation, | ) ) ) | 2007L013958<br>CALENDAR/ROOM T<br>TIME 00:00 |
| *Defendant,* | ) ) | Other Com Litigation |
| HARRIS, N.A., an Illinois corporation, | ) ) | |
| *Garnishee.* | ) | |

## NOTICE OF EMERGENCY MOTIONS

    PLEASE TAKE NOTICE that on December 14, 2007, at 9:15 a.m., or as soon thereafter as counsel may be heard, we shall appear before The Honorable Judge Alexander P. White, or any judge sitting in his stead, in the courtroom usually occupied by him in Room 2503 of The Richard J. Daley Center, Chicago, Illinois, for presentation of **Plaintiff's Emergency Motion for Issuance of Order of Attachment and Ex-Parte Motion for Appointment of Special Process Server**, copies of which are attached hereto and previously filed on December 14, 2007.

Dated: December 14, 2007

                    Respectfully submitted,

                    WACHOVIA BANK, N.A..

                    By: _____
                        One of Its Attorneys

Barry S. Rosen
Michael D. Richman
Michael S. Leib
REED SMITH, LLP
10 S. Wacker Drive
Chicago, Illinois  60606-7507
(312) 207-1000
Firm I.D. # 43456

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| **WACHOVIA BANK,** | ) | |
| **NATIONAL ASSOCIATION,** | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| **MAJAPARA CASA DE CAMBIO S.A. de C.V.,** | ) | 2007L013958 |
| **a Mexican corporation,** | ) | CALENDAR/ROOM T |
| | ) | TIME 00:00 |
| *Defendant,* | ) | Other Com Litigation |
| | ) | |
| **HARRIS, N.A., an Illinois corporation,** | ) | |
| | ) | |
| *Garnishee.* | ) | |

## EX-PARTE MOTION FOR APPOINTMENT OF
## SPECIAL PROCESS SERVER

Plaintiff, Wachovia Bank, N.A. ("Wachovia"), by its attorneys, respectfully move for the immediate entry of an order appointing It's Your Serve, 134 N. LaSalle St., Suite 750, Chicago, IL 60602, License #117-000-885, as special process server to make service of process in this cause. In support thereof, Wachovia states as follows:

1. The person named above is of the age of 18 or older and is not a party to the action.

2. Wachovia has filed its Affidavit for an Order of Attachment and Emergency Motion for Issuance of Order of Attachment, and concurrently herewith to seize certain property allegedly held by the Harris Bank in Chicago.

3. Due to the exigent nature of these proceedings, as more fully detailed in the concurrently filed Affidavits in Support of Attachment, service of all process in this need to be perfected as soon as possible.

4.     In order to assure all parties receive timely service in these proceedings, Wachovia seeks a special process server who will affect service in the swiftest possible manner.

Dated: December 14, 2007

Respectfully submitted,

WACHOVIA BANK, N.A..

By: _____
One of Its Attorneys

Barry S. Rosen
Michael D. Richman
Michael S. Leib
REED SMITH, LLP
10 S. Wacker Drive
Chicago, Illinois  60606-7507
(312) 207-1000
Firm I.D. # 43456

311232/00001/957376/Version #:.1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| WACHOVIA BANK,<br>NATIONAL ASSOCIATION, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | Case No. |
| v. | ) <br> ) | |
| MAJAPARA CASA DE CAMBIO S.A. de C.V., | ) | |
| Defendant, | ) <br> ) | |
| HARRIS N.A., | ) <br> ) | |
| Garnishee. | ) | |

## PLAINTIFF'S EMERGENCY MOTION FOR ISSUANCE OF ORDER OF ATTACHMENT

Plaintiff Wachovia Bank, N.A. ("Wachovia"), through its attorneys, Reed Smith, LLC, and pursuant to 735 ILCS 5/4-101 *et seq.* of the Code of Civil Procedure hereby requests that this Court immediately grant Wachovia's motion for issuance of an Order of Attachment in accordance with §4-110 of the Attachment Act, directed to and seizing any and all property and accounts in the name of or for the benefit of defendant Majapara Casa De Cambio S.A. de C.V. ("Defendant") held at or in the possession, custody or control of the named garnishee herein, Harris Bank, located at 111 West Monroe, Chicago, Illinois, including but not limited to Bank Account Number 2004919. In support thereof, Wachovia states as follows.

## I.    FACTUAL BACKGROUND TO ISSUANCE OF ORDER OF ATTACHMENT.

This case involves the Defendant, Majapara Casa De Cambio S.A. de C.V. ("Majapara" or "Plaintiff"), a Mexican company, having taken from Wachovia over $38,000,000.00 worth of Euros in a series of foreign exchange transactions and failing to return the corresponding amount of U.S. Dollars. Defendant agreed with Wachovia on

Wednesday, December 5, 2007 to send Wachovia $38,132,700 (US$) in return for 26 million Euros. Yet on the agreed upon settlement date, December 7, 2007, Defendant received the 26 million Euros from Wachovia knowing it would not pay Wachovia the corresponding $38,132,700. Defendant has not provided Wachovia with the promised $38,132,700 (US$), nor has it returned the 26 million Euros Wachovia provided Defendant, thereby prompting the need for extraordinary relief in the form of a prejudgment attachment to protect Wachovia from further potential catastrophic loss.

Commencing in the late 1990's or early 2000's, Wachovia, and its predecessor, entered into a series of foreign exchange agreements with Defendant, a resident of the country of Mexico. (*See* Affidavit in Support of Attachment, filed concurrently herewith).[1] In these transactions, Defendant would agree to purchase from Wachovia (or its predecessor) a certain amount of one currency in exchange for Defendant selling to Wachovia an equivalent amount of another currently, at the applicable exchange rate then in effect.[2]

To facilitate the foreign exchange agreement process, Defendant and Wachovia, or its predecessor, entered into a written contract pursuant to which Defendant was permitted to execute foreign exchange transactions with Wachovia's predecessor over the Internet. By custom in the foreign exchange industry, these transactions are agreed to and close quickly and, as such, the foreign exchange industry is built on trust. If a party in a foreign exchange transaction fails to honor its contractual obligation in terms of delivering the promised currency by the settlement date, that party is deemed untrustworthy.

---

[1] The Facts recited in this Motion are supported by Wachovia's Affidavit, filed pursuant to §4-105 of the Attachment Act.

[2] Defendant is a non-Illinois resident. Nothing in the Illinois Secretary of State' records reflect that Defendant is currently licensed or authorized to conduct business in Illinois; nor do those records reflect that Defendant has currently procured a certificate of authority to conduct business in this State.

On or about December 5, 2007, Defendant entered into seven such foreign exchange transactions with Wachovia, which, when combined, were worth over $38 million United States dollars. All seven foreign exchange transactions were to have settled by December 7, 2007. Six of those transactions were executed through Wachovia's foreign exchange internet website. The one remaining transaction was executed over the telephone. As required by the seven foreign exchange transactions, on December 7, 2007—the scheduled settlement date— Wachovia sent Defendant 26 million Euros. Despite having entered into the transactions with Wachovia just two earlier, on December 5, 2007, Defendant never delivered the corresponding agreed upon $38,132,700 (US$) to Wachovia, as required, on December 7, 2007. After certain setoffs are applied in Defendant's favor, Wachovia has suffered a loss of $24,711,845.

Defendant's intentional act in accepting over $38 million worth of Euros with no intention of delivering the corresponding dollars shows their fraudulent conduct. But Wachovia has learned additional facts that lead it to believe Defendant is intentionally concealing or disposing of its assets or is about to do so. First, on or about December 7, 2007—the settlement date for the foreign exchange transactions at issue—Defendant requested that Wachovia enter into *further* cash transactions. Defendant made this request despite the fact that, by this point in time (December 7th), Defendant already knew it was *not* going to settle the outstanding foreign exchange transactions with Wachovia worth over $38 million. Second, on or about December 11, 2007, Majapara tried (unsuccessfully) to transfer over $9 million out of its Wachovia account. Finally, on or about December 13, 2007, a representatives of Wachovia spoke with Jorge Ortiz, the Chairman and CEO of Defendant. Mr. Perez told these representatives that Defendant took Wachovia's 26 million Euros and lent

it to other people even though, under Mexican law, a Casa de Cambio does not have a right to lend money. When Mr. Ortiz was told that what Defendant had done was not legal, Mr. Ortiz told the Wachovia representatives that Majapara was not liquid and he would need two months to repay Wachovia. He also told the representatives that if Wachovia took action to assert its legal rights, Wachovia would not recover anything. In addition, after Majapara failed to pay its obligation to Wachovia, Defendant attempted to drain its remaining assets in its Wachovia depository account, transferring them to Citibank, N.A.

For the past several years, and to Wachovia's knowledge, Defendant has regularly utilized the banking facilities of Harris Bank, located at 111 West Monroe Street, Chicago, Illinois ("Harris Bank"), for the purpose of furthering its foreign exchange business in this country. To Wachovia's knowledge, Defendant currently maintains one or more banking account at the Harris Bank in Chicago. At least one Bank Account at Harris Bank exists in Defendant's name under Account Number 2004919, thereby making this case ripe for the issuance of an order of attachment directed against Defendant and all its property now being held at Harris Bank. On information and belief, Defendant also engages in substantial and continuous business in Chicago.

## II.   THE ELEMENTS FOR ISSUANCE OF AN ORDER OF ATTACHMENT ARE PRESENT, WARRANTING AN ATTACHMENT BE ISSUED ON DEFENDANT'S PROPERTY AT HARRIS BANK.

Wachovia requests that this Court enter an emergency order of attachment under the applicable provisions of the Attachment Act (735 ILCS 5/4-101 *et seq.*) directed to Defendant and any and all banking accounts or other property of any kind or nature kept or maintained at Harris Bank, in Chicago. In particular, that this Court enter an order of attachment directed to Defendant and Harris Bank, Account Number 2004919, or any other accounts or property maintained thereat by Defendant. *See also*, §4-126 of Attachment Act (attachment of debtor's property held by others). Wachovia has satisfied each of the requisite elements for issuance of such an Order.

There are, essentially, two central components that need be satisfied before the Court is empowered to issue an order of Attachment: (1) "cause" under §4-101 of the Act must be shown by demonstrating the existence of one of the nine statutory factors, and (2) the creditor need post a bond in the amount set forth in §4-107 (or, §4-108, if the value of the property being seized is ascertained at the time). Wachovia has satisfied both prongs, warranting the issuance of the Order against Defendant and Harris Bank.

### A.   The Presence of "Cause" Under §4-101(1) Supports An Attachment Order Because Defendant Indisputably Is Not An Illinois Resident.

Several overriding principles support entry of an Attachment Order. *First*, attachment is the legal process by which the court seizes and holds the property of the defendant debtor until the rights of the parties are ultimately determined in the creditor's principal suit. *See*, *Peter Fischer Import Motors, Inc. v. Buckley,* 121 Ill. App. 3d 906, 910, 460 N.E.2d 346, 349 (1st Dist. 1984); *Old Kent Bank v. Stoller,* 254 Ill. App. 3d 1085, 1092, 627 N.E.2d 265,

273 (1st Dist. 1993); *Revolution Portfolio, LLC v. Beale,* 341 Ill. App. 3d 1021, 1026, 793 N.E.2d 900, 905 (1st Dist. 2003). Attachment may be directed at either the defendant's property "or his property in the possession of a third party." *Peter Fischer Imports,* 121 Ill. App. 3d at 910, 460 N.E.2d at 349. Attachment is a mechanism instituted "before judgment on the merits of the principal claim of the plaintiff creditor." *Id.* Thus, attachment lies to seize property of the debtor in the possession of a third party, garnishee. In such a situation,

> "...**the plaintiff attempts to hold the defendant's property in the possession of a third party pending the disposition of the plaintiff's principal claim against the defendant.** Such a proceeding is actually a pre-judgment proceeding in attachment, where the defendant's property which is attached is in the possession of a third party."

(*Peter Fischer Imports,* 121 Ill. App. 3d at 910, 460 N.E.2d at 345.)[3]

*Second,* the Attachment Act specifically provides that the Act shall be construed in a "*liberal* manner for the detection of fraud." *See* §4-102. "The statute was one intended to prevent fraud and must be liberally construed, and the courts should give it a reasonable construction in order to attain that end." *Dodge v Yates,* 21 Ill. App. 547, 1886 WL 5713, at *3 (2d Dist. 1886). Recent caselaw confirms this approach. *See, Old Kent Bank,* 254 Ill. App. 3d at 1097, 627 N.E.2d at 272 ("...section 4-102 of the Act requires a court to construe the attachment statute 'in the most liberal manner for the detection of fraud.'"). That liberal construction animating the Act bolsters supporting the issuance of the Order, since Wachovia claims, in part, that the actions of Defendant were fraudulent in misappropriation of Wachovia's monies.

---

3 All emphasis is added unless otherwise noted.

*Third,* since the Attachment Act clearly empowers the Court to seize the property of the debtor (the Defendant, herein) in the possession of a third party (here, Harris Bank), the next issue is whether Wachovia has satisfied the underlying grounds for issuance of an Attachment Order. The Act unambiguously provides it has. Section 4-101 of the Act lists the nine specific grounds needed for issuance of an Attachment Order, only one of which, though, need be satisfied to show the requisite "cause". *See, Old Kent Bank,* 254 Ill. App. 3d at 1094, 627 N.E.2d at 270 ("We first consider whether *any* of the provisions of section 4-101 of the Act were satisfied.") Section 4-101(1) provides Wachovia with such a statutory ground and states as follows:

"Where the debtor is not a resident of this State."

Here, the Defendant-debtor falls within the meaning of §4-101(1) of the Act, as it is *not* an Illinois resident. Instead, Defendant is a resident of and is located in Mexico City, Mexico. Defendant does not qualify as an Illinois "resident" since the Illinois Secretary of State records do not reflect it being currently authorized to do business in Illinois or having a current certificate of authority as a foreign corporation.

Two other statutory grounds support issuance of the Order of Attachment. Section 4-101(7), (8) states as follows:

"7.    Where the debtor has, within 2 years prior to the filing of such affidavit, fraudulently concealed or disposed of his or her property so as to hinder or delay his or her creditors."

"8.    Where the debtor is about fraudulently to conceal, assign, or otherwise dispose of his or her property or effects, so as to hinder or delay his or her creditors."

Here, the Affidavit submitted by Wachovia attests that, after Defendant had received Wachovia's Euros, Defendant improperly used that same money for purposes of alleviating the Defendant's alleged "liquidity crisis," rather than ensuring that Wachovia be paid in corresponding currency, as was required under the parties' foreign exchange agreements. The Affidavit specifically points out Defendant's intent to frustrate and hinder Wachovia from collecting any of its millions of dollars owed to it by Defendant if Wachovia elects to enforce its rights with respect to the transactions at issue. As noted by one Illinois appellate court: "The proper inquiry under the [Attachment] statute is whether [defendant's] actions were made with the intent to hinder or delay plaintiff." *Amcore Bank, N,A., Rock River Valley v. Hahnaman-Albrecht, Inc.,* 305 Ill. App. 3d 63, 710 N.E.2d 435, 438 (2d Dist. 1999). The submitted Affidavits clearly confirm this to have been the case given Defendant's improper disposition of its assets in an effort to frustrate Wachovia from receiving its entitled payment, Defendant's acknowledgement that it used Wachovia's Euros to make illegal loans, Defendant's statement that it is illiquid, and Defendant's attempt to take over $9 million out of its Wachovia account.

Nor is there any question that the *type of claim* to be asserted by Wachovia in its principal lawsuit against Defendant falls within the express language of §4-101. That provision empowers the court to issue an Order of Attachment when "a creditor ha[s] a money claim, whether liquidated or unliquidated, in contract or tort...." Wachovia has alleged such a claim in its Affidavit. Wachovia asserts that it has a claim against Defendant for money based in contract on either a liquidated or unliquidated amount.

Wachovia, therefore, has satisfied both key prongs under §4-101 for showing "cause" to issue an Order. Wachovia has shown that (a) Defendant is not an Illinois resident for

- 8 -

purposes of §4-101(1), and (b) its underlying claim to be asserted in the principal complaint sounds in "contract" for a "liquidated or unliquidated" amount. Given these twin facts, Wachovia has satisfied the requisite "cause" under §4-101 for issuance of an Order of Attachment. Indeed, Illinois courts have upheld the issuance of an order of attachment under §4-101 of the Act based, among other grounds, upon finding that a claim for monies due under a promissory note (the contract claim for a liquidated amount), when coupled with the debtor's non-Illinois residency (§4-101(1)). *See Old Kent Bank*, 254 Ill. App. 3d at 1094-1097, 627 N.E.2d at 270-272.

**B.**    **Wachovia Has Satisfied The Bond Requirement Under Section 4-107 Of The Attachment Act.**

The second key component that need be satisfied for issuance of an Order of Attachment is the posting of the requisite bond under §4-107 (or, potentially, under §4-108 if the circumstances warrant.) Wachovia stands ready, willing and able to duly satisfy that requirement.

**III.    CONCLUSION**

For all of the foregoing reasons, Plaintiff, Wachovia Bank, N.A., prays that this Court grant its Emergency Motion For Issuance of Order of Attachment, and enter an Order of Attachment directed against Defendant Majapara Casa De Cambio S.A. de C.V., and Harris Bank in Chicago, as more particularly described in the concurrently filed Affidavit.

Dated: December 14, 2007

Respectfully submitted,
*WACHOVIA BANK, N.A.*
Plaintiff,

By: _____
One of Its Attorneys

Barry S. Rosen
Michael D. Richman
Michael S. Leib
REED SMITH
10 S. Wacker Drive
Chicago, IL 60606

Attorneys for Plaintiff

CHILIB-2126850.2

- 10 -

N THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| WACHOVIA BANK,<br>NATIONAL ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | 2007L013958 |
| MAJAPARA CASA DE CAMBIO S.A. de C.V., | ) ) | CALENDAR/ROOM T<br>TIME 00:00 |
| Defendant, | ) ) | Other Com Litigation |
| HARRIS N.A., | ) ) | |
| Garnishee. | ) | |

## ADDITIONAL STATEMENT

Plaintiff Wachovia Bank, National Association, for its additional statement pursuant to

735 ILCS 5/4-104, states as follows:

1.    The action invoked by the Affidavit of Carlos A. Perez does sound in tort.

2.    The return day for the summons to be issued in the action is designated as ~~December~~ January 11, 2008.

Dated: December 14, 2007

Respectfully submitted,
*WACHOVIA BANK, N.A.*
Plaintiff,

By: _____
One of Its Attorneys

Barry S. Rosen
Michael D. Richman
Michael S. Leib
REED SMITH LLP
10 S. Wacker Drive
Chicago, IL 60606
Attorneys for Plaintiff
Firm ID: 43456

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

WACHOVIA BANK, N.A.,                          )
                                              )
    Plaintiff,                            )
                                              )    Case No.
    v.                                    )
                                              )    2007L013958
MAJAPARA CASA DE CAMBIO S.A. de C.V.,         )    CALENDAR/ROOM H
                                              )    TIME 00:00
    Defendant,                            )    Other Com Litigation
                                              )
Harris, N.A., a National Association,         )
                                              )
    Garnishee.                            )

### AFFIDAVIT OF CARLOS A. PEREZ

I, Carlos A. Perez, being first duly sworn upon oath state as follows:

1.    I have personal knowledge of the facts contained herein and, if called upon as a witness, I could and would competently testify thereto.

2.    I am Managing Director, Americas Group, Global Financial Institutions & Trade Services, Wachovia Bank, N.A. ("Wachovia"). Wachovia has its principal place of business in Charlotte, North Carolina.

3.    Majapara Casa de Cambio S.A. de C.V. ("Majapara"), a Mexican corporation, is a customer of my group.

4.    Majapara resides and is located at Grecia No. 64, Colonia San Alvaro, Mexico City, C.P. 02090, Mexico.

5.    This Affidavit of Attachment is being brought in relation to the misappropriation of over $38 million by Majapara, through a series of foreign exchange transactions between the parties.

6.    On Wednesday to December 5, 2007, Majapara agreed with Wachovia to a series of foreign exchange transactions by which Wachovia would send Majapara 26 million Euros in return for Majapara sending Wachovia 38,132,700 U.S. Dollars at the applicable exchange rate. Each side was required to transmit the funds on December 7, 2007.

7.    Wachovia sent Majapara the agreed 26 million Euros on or about 2 am on December 7, 2007.

8.    Despite receiving and accepting over $38 million Wachovia's funds, Majapara has not provided Wachovia with the promised $38,132,700 (US$). Nor has Majapara returned the 26 million Euros Wachovia provided to it.

9.    Majapara has an account with Harris Bank in Chicago and on information and belief, its engages in continuous and substantial business in Chicago.

10.    Majapara is in the business of "foreign exchange."

11.    Foreign Exchange contracts are trading contracts that involve minimum documentation. It is the nature of foreign exchange contracts that each counterparty must transmit funds trusting the other to do so simultaneously. Such contracts therefore involve a great deal of trust on each side. A party to a foreign exchange transaction who fails to settle as required is thereby rendered untrustworthy and not deemed suitable for further transactions of this nature. Should such information become public, this party would be unable to engage in such transactions with any substantial institution. Given that foreign exchange is the foundation of Majapara's business, it would not have defaulted under its contract absent substantial economic difficulties, and its default is likely to spell its doom.

12.    Thus, in order to protect its rights, Wachovia seeks an attachment of a bank account Majapara keeps at Harris Bank.

13.    As background, since 1998, Majapara and First Union National Bank (a predecessor to Wachovia) agreed to enter into foreign exchange transactions together. In these

2

transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union an equivalent amount of another currency at the applicable exchange rate.

14.    In order to facilitate Majapara and First Union National Bank ("First Union") entering into these currency exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement, a copy of which is attached hereto as Exhibit A. Pursuant to this FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions with First Union over the Internet through First Union's foreign exchange website. The FX Subscription Agreement did not preclude the parties from entering into foreign exchange transactions with each other in other manners. This FX Subscription Agreement is governed by New York Law. See Exhibit A ¶ 6.

15.    In September 2001, First Union Corporation and Wachovia Corporation merged. As a result of the merger, the FX Subscription Agreement was assigned to Plaintiff Wachovia Bank, N.A.

16.    On or about December 5, 2007, Majapara and Wachovia agreed to do a series of seven (7) transactions, all of which were to be settled on December 7, 2007, whereby Wachovia would deliver 26 million Euros to Majapara and Majapara would deliver $38,132,700 to Wachovia. Instead of the dollars being deposited into Majapara's account at Wachovia and then Wachovia debiting the currency from the Majapara account, these transactions required Majapara to transfer dollars directly to Wachovia at a Wachovia-owned New York branch account. Six (6) of the transactions were executed on Wachovia's foreign exchange internet website. One (1) of the transactions was executed over the telephone. A copy of confirmations of each of these transactions is attached hereto as Exhibit B.

3

17.    Pursuant to the seven (7) foreign exchange agreements, on December 7, 2007, Wachovia sent 26 million Euros to Majapara.  Even though they had just entered into the deals two days earlier on December 5, 2007, Majapara did not deliver the agreed upon $38,132,700 to Wachovia, as required, on December 7, 2007.

18.    Despite its failure to deliver the dollars, Majapara continued to try to place additional trades with Wachovia on December 7, 2007, even though it knew it could not cover such additional trades or its obligation to deliver the dollars.    Wachovia was able to stop such additional trades from being executed.

19.    In addition, on December 11, 2007, two deposits came into Majapara's Wachovia account totaling $9,460,000.    Despite owing a multiple of this amount to Wachovia, Majapara sent instructions to Wachovia on December 11, 2007 to forward those funds to Majapara's account at Citibank.  This action, essentially, would have cleaned out all of Majapara's assets in its Wachovia account.

20.    By opening an account at Wachovia, however, Majapara agreed to Wachovia's Terms & Conditions for Global Financial Institutions, which includes a provision providing Wachovia with setoff rights.  See Terms and Conditions, attached hereto as Exhibit C.  Through its setoff rights, Wachovia was able to prevent Majapara from draining the account, and obtained funds to compensate it for its loss, leaving $24,711,845 now due.

21.    In addition, Wachovia has additional exposure to Majapara to cover returned items in the federal check claims process (bounced checks), which may aggregate as to Majapara over $3 million per month, into the future.

22.    After Majapara defaulted, my department made contact with Majapara to demand payment and to understand why Majapara did not pay Wachovia, as it was required to do.

4

23.    On Thursday December 13, 2007 at approximately 9:52 am Eastern, I spoke by telephone with Jorge Ortiz, Majapara's Chairman and CEO.    I know Mr. Ortiz well and have met with him and spoken to him many times.    I was joined in the telephone call by Juanita Gomez, a Vice President in my group who is our Mexico representative.

24.    I asked Mr. Ortiz in our call what Majapara did with Wachovia's money.

25.    Mr. Ortiz acknowledged and admitted that Majapara was obligated to provide the agreed upon currency to Wachovia and owed Wachovia over $30 million.

26.    He then stated that Majapara had received Wachovia's Euros and used them for other purposes because it was experiencing "a liquidity crisis."

27.    I then asked him if he lent the money to third parties.  He said "yes."

28.    I said, "That's not legal."

29.    He said:  "I recognize that we have done something that is not permitted."

30.    Majapara is a Mexican "Casa de Cambio," a company in the business of currency exchange, such as exchanging Mexican pesos for dollars.  Such companies, under Mexican law, are not permitted to make loans.

31.    I then asked Mr. Ortiz when Majapara would be able to repay Wachovia.

32.    He said that he "needed time to collect the money from others who he had lent Wachovia's money to." He said Majapara "would need two months to collect."

33.    Based on the above information, it is my information and belief that Majapara engaged in a fraud.  Due to its "liquidity crisis," Majapara did not have sufficient funds to complete the exchange with Wachovia and to engage in the other lending or other activities.  It nonetheless accepted Wachovia's funds, knowing that it would not have the funds to repay Wachovia for a lengthy period of time, if at all.  It then used Wachovia's funds to engage in

illegal lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligations to transfer over $38 million to Wachovia.

34.     Mr. Ortiz told me that if Wachovia took legal action against Majapara, Wachovia would end up with nothing.

35.     Under Wachovia's Terms & Conditions for Global Financial Institutions, the terms and conditions are governed by and construed in accordance with the laws of New York and Majapara agreed to submit to the jurisdiction of the courts located in Manhattan, New York.

36.     For the reasons stated above, Wachovia has a just claim against Majapara.

37.     I believe that Wachovia is entitled to recover against Majapara, after allowing all just credits and set-offs, $24,711,845, which is now due. I further expect that Majapara will have additional amounts owing to Wachovia for returned items, as described above.

38.     I have good reason to believe and do believe that Majapara is not a resident of this State and is, instead, a resident of Mexico.

39.     Further, for the reasons stated above, including the fact that Majapara accepted 26 million Euros from Wachovia without any intention of completing their end of the transaction, tried to get Wachovia to continue to trade with it on December 7, 2007 when they clearly knew they could not fulfill their end of any trade, tried to quickly take funds that were deposited in its Wachovia account and have them transferred to their Citibank account, admitted to me and Ms. Gomez that Majapara was illiquid, and stated that if Wachovia moved to assert its legal rights, it would not recovery anything, Wachovia has good reason to believe and does believe that Majapara either has already fraudulently concealed or disposed of its property so as to hinder or delay its creditors or is about to conceal, assign, or otherwise dispose of its property or effects, so as to hinder or delay its creditors.

**FURTHER AFFIANT SAYETH NOT.**

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

Executed this 13th day of December 2007 in Miami, Florida.

By: _____
        Carlos A. Perez

Signed and sworn to before me
this 13th day of December 13, 2007


Notary Public

CHILIB-2126822.3

ELENA PEREZ CAPIRO
MY COMMISSION # DD 705363
EXPIRES: August 15, 2011
Bonded Thru Notary Public Underwriters

7

A



# FIRST UNION ONLINE FX SUBSCRIPTION AGREEMENT

This First Union Online FX Subscription Agreement ("*Agreement*") sets forth the terms and conditions on which the party identified on the signature page hereof as the Subscriber ("*Subscriber*") may execute foreign exchange transactions with First Union National Bank ("*FUNB*") over the Internet ("*Online Transactions*") through FUNB's foreign exchange website currently operating at http://www.firstunion.com/capitalmarkets/fx ("*FX Website*"). This Agreement is not intended to preclude the parties from entering into foreign exchange transactions with each other in any other manner. Subject to the terms and conditions of this Agreement, Subscriber and FUNB agree as follows:

## 1. Internet Access

In order for Subscriber to communicate with FUNB through the FX Website, Subscriber shall be responsible for (i) arranging its own access to the Internet through such providers of telephonic, wireless, and/or Internet access services as it deems necessary or desirable, and (ii) all costs and expenses associated with such services, including connection charges. FUNB shall not be responsible for any acts or omissions of any of such Subscriber's service providers in the course of transmitting, receiving, handling or storing communications between Subscriber and FUNB or otherwise.

## 2. FX Website Access

(a) In order for Subscriber to communicate with FUNB through the FX Website, one or more of Subscriber's officers or employees designated by Subscriber (each, a "*User*") will be issued a unique digital certificate ("*Digital Certificate*") to be stored on the web browser of a personal computer intended to be used by the User to carryout his/her functions for Subscriber, together with a User identification number ("*ID*") and a unique personal password ("*Password*"). Each Digital Certificate is unique to the User, and if a User wishes to use more than one computer or browser to access the FX Website, the User must request an additional Digital Certificate for each such computer or browser. FUNB reserves the right to limit the number of Digital Certificates issued to Subscriber and its Users. Subscriber agrees that, before any User is provided with any Digital Certificate, that User will have (i) requested from the First Union National Bank Certificate Authority ("FunbCA"), and completed the process necessary to receive, a Digital Certificate (including the use of "shared secrets" with FUNB and any other security measures which the FunbCA may require to validate the User's identity) and (ii) accepted the terms and conditions of the Digital Certificate Documents. "*Digital Certificate Documents*" means the First Union National Bank Certificate Authority Subscriber Agreement ("FunbCA Subscriber Agreement"), which is presented to and agreed to by User during the online Digital Certificate application process, and each document that the FunbCA Subscriber Agreement incorporates by reference. The Digital Certificate Documents will govern each Digital Certificate and its use and be binding upon the Subscriber and that User in his/her individual capacity, and for that purpose the term "Subscriber" in the FunbCA Subscriber Agreement shall be deemed to refer to each of the Subscriber and the User, respectively. This Agreement is the "Master Agreement" referred to in the FunbCA Subscriber Agreement. Nothing in this Agreement is intended to supersede, modify, limit, or restrict anything contained in the Digital Certificate Documents, and in the event of any inconsistency between the provisions of this Agreement relating to the Digital Certificate and the provisions of the Digital Certificate Documents, the FunbCA Subscriber Agreement will prevail. The rights and obligations of Subscriber and FUNB under this Agreement and the Online Transactions (or any other transactions between the parties) are not conditioned on either party's compliance with anything contained in the Digital Certificate Documents.

(b) Subscriber acknowledges that, after a User has received a Digital Certificate, Password and ID from the FunbCA, anyone who uses the Digital Certificate belonging to that User together with that User's Password and ID will be able to access and use the FX Website on behalf of Subscriber as contemplated by this Agreement. Accordingly, Subscriber shall not allow anyone to use a Digital Certificate, Password or ID belonging to a User other than the User who has received the same from the FunbCA. Subscriber hereby authorizes FUNB to deliver a temporary password to each User for the initial login to the FX Website for the purposes of applying for a Digital Certificate and to establish a permanent Password and ID. The Subscriber shall inform FUNB immediately when a User is no longer authorized to use the FX Website. Subscriber shall be solely responsible for controlling, and preventing any unauthorized use of, each Digital Certificate, Password and ID, and Subscriber shall be liable for any and all Online Transactions and account debits, credits and transfers resulting from, or occurring in response to, any electronic transmission, instruction, signal, entry or other communication to FUNB through the FX Website made using any Digital Certificate, Password and ID, whether or not it was authorized by Subscriber, was initiated by a User or resulted from an error in entering any information or command, and all such communications shall be deemed to have been sent by Subscriber for purposes of this Agreement.

(c) FUNB reserves the right, at any time and from time to time, for any reason or no reason, and without notice, to upgrade, modify, suspend, discontinue, or terminate the FX Website or to revoke any Digital Certificate, Password or ID, or to deny Subscriber and its Users access to the FX Website or any part thereof, and the respective rights and obligations of Subscriber and FUNB under the Online Transactions (or any other transactions between the parties) shall not be impaired or otherwise affected by such action. In addition, FUNB may require Subscriber to replace or erase any Digital Certificate or change any Password or ID at any time.

1

3. **Procedures for Entering into Online Transactions**

(a) To initiate any Online Transaction with FUNB through the FX Website, Subscriber must make certain entries regarding the financial particulars of the proposed Online Transaction on the appropriate screen displays of the FX Website in accordance with instructions provided in FUNB's "Online FX User's Guide", including currency codes, currency amounts, and the side of the currency exchange Subscriber is taking. It shall be the responsibility of Subscriber that each User will have received, read and understood the Online FX User's Guide prior to that User using the FX Website. FUNB reserves the right to revise or replace the Online FX User's Guide without Subscriber's consent by delivering to Subscriber a copy of the revision or replacement.

(b) When the requisite entries have been made to initiate an Online Transaction, then the FX Website will display an exchange rate for the proposed Online Transaction ("*Exchange Rate*"), subject to a time-out function. Subscriber may accept or reject the Exchange Rate by making the appropriate entry on the FX Website before it is timed-out, or otherwise reject the Exchange Rate by allowing it to be timed-out. By entering its acceptance of the Exchange Rate before it is timed-out, Subscriber will be deemed to have made an offer to FUNB for the proposed Online Transaction at that Exchange Rate. Upon FUNB's issuance through the FX Website of a deal confirmation number for that Online Transaction, FUNB will be deemed to have accepted such offer and a contract for such Online Transaction shall be deemed to have been entered into by Subscriber and FUNB. If FUNB does not issue a confirmation number for the proposed Online Transaction through the FX Website, Subscriber's offer to enter into the proposed Online Transaction shall be deemed rejected and no contract for the proposed Online Transaction will have been formed. The FX Website Records shall be conclusive and binding on the parties with respect to the foregoing. "*FX Website Records*" means the books and records of FUNB (in electronic form or otherwise) as they relate to the FX Website, including any stored on or generated by any computer system, hardware or software or any other system, facility or service on which the FX Website directly or indirectly operates ("*Operating System*"), whether such Operating System is owned by FUNB or by any independent contractor or supplier engaged by FUNB (or an affiliate of FUNB) in order for the FX Website to operate ("*System Supplier*").

(c) Once a confirmation number for an Online Transaction has been issued by FUNB through the FX Website, Subscriber may not (i) withdraw, cancel, or amend its offer for that Online Transaction, or (ii) without the prior written consent of FUNB, amend the terms of that Online Transaction. Subscriber acknowledges that a confirmation number may be issued instantly when an Exchange Rate has been accepted, and that Online Transactions bind it as principal for its own account.

(d) Exchange Rates quoted to Subscriber may be different from those which FUNB may quote to any of its other customers, and no representation or warranty is made that any Exchange Rate is the best price available to Subscriber. FUNB reserves the right at any time, without notice, to not quote an Exchange Rate to Subscriber, or to not issue a confirmation number, for any proposed Online Transaction for any reason or no reason.

4. **Terms and Conditions of Online Transactions**

(a) The terms and conditions of each Online Transaction entered into by FUNB and Subscriber shall be evidenced by this Agreement and the FX Website Records. In addition, if Subscriber and FUNB are parties to any agreement governing any foreign exchange transactions (including any ISDA Master Agreement published by the International Swaps and Derivatives Association, Inc.), then this Agreement shall be supplemental to that agreement, and the Online Transactions shall be subject to its terms and conditions (except when they are contrary to the provisions hereof, this Agreement will govern, and for that purpose any procedures for executing or confirming transactions specified in that other agreement shall be disregarded with respect to the Online Transactions).

(b) Each Online Transaction involves the Subscriber's purchase from FUNB of one currency ("*Bought Currency*") in exchange for Subscriber's sale to FUNB of another currency ("*Sold Currency*") at the applicable exchange rate. For each Online Transaction, Subscriber shall deliver to FUNB the required amount of Sold Currency on the date the parties enter into that Online Transaction regardless of the value date specified for that Online Transaction. Upon FUNB's receipt of the required amount of Sold Currency, FUNB shall deliver to Subscriber the required amount of Bought Currency on the value date of that Online Transaction. For each Online Transaction, the delivery of any currency to either party shall be made to a reasonably acceptable bank account as such party shall have specified in delivery instructions for that Online Transaction either (i) on the FX Website, or (ii) if not so specified, then by written notice.

(c) If the delivery of any Bought Currency or Sold Currency cannot be made because the value date of the relevant Online Transaction is not a day on which banks in the relevant place of receipt settle foreign exchange in the relevant currency, the value date thereof shall be the next following day on which such settlement can be made. In addition, whenever the same currency is due by both parties on the same day under two or more foreign exchange transactions (whether or not any is an Online Transaction), then the delivery obligations of the parties on that day in that currency for those foreign exchange transactions will be discharged automatically, and if one party's delivery obligation in that currency would have been greater, replaced by an obligation of such party to deliver the difference to the other party.

2

(d) Subscriber acknowledges that currency exchange rates are highly volatile and impossible to predict, that the value of a currency relative to another currency can rise and fall substantially over short periods, that Subscriber understands those risks and the consequences of entering into the Online Transactions through the FX Website (whether financial, accounting, tax, legal, or otherwise) based upon its own evaluation of the Online Transactions or upon the advice of its professional advisors, that neither FUNB nor any of its affiliates is acting as an agent, broker, advisor or fiduciary of, or a joint venturer with, Subscriber in any respect in connection with the Online Transactions or the FX Website, regardless of whether FUNB acts as an advisor or fiduciary to Subscriber on other matters or provides Subscriber from time to time with market information, views or recommendations.

## 5. Confidentiality & Restriction on Use

(a) Subscriber acknowledges that the FX Website, the Operating System and all programs, files, data or other information stored, contained, or operating at, in or through, the FX Website or Operating System are the exclusive property of FUNB or a System Supplier, that other foreign exchange customers of FUNB will be using the FX Website to conduct their own transactions with FUNB, and that Subscriber agrees for the respective benefits of FUNB and each System Supplier that neither Subscriber nor any User will (i) access or use the FX Website or the Operating System for any purpose other than as a facility through which Online Transactions may be conducted; (ii) alter or interfere with the FX Website, the Operating System or any of the programs, files, data or other information stored, contained, or operating at, in or through, the FX Website or the Operating System; (iii) sell any information obtained from or through the FX Website or the Operating System, including any Exchange Rate; (iv) use any such information for any purpose other than to consider, evaluate, propose, enter into, review or otherwise conduct Online Transactions, or (v) disclose any such information to any third party, except Subscriber may make any such disclosure (1) to Associated Persons, (2) as required by law, or (3) pursuant to any legal or regulatory process, action or proceeding, whether Subscriber is responding thereto or has initiated the same to protect its interests or enforce its rights. "Associated Persons" means the affiliates, directors, officers, employees, agents, advisors, auditors, attorneys, and regulators of Subscriber and those of its affiliates.

(b) Subscriber further acknowledges and agrees that any Operating System owned by a System Supplier may capture any or all data generated by any electronic transmission, instruction, signal, entry or other communication to FUNB through the FX Website, that therefore such System Supplier will have access to information concerning Subscriber's Online Transactions and its FX Website activities, and that such System Supplier is authorized to disclose any or all data captured by the Operating System provided it does so without disclosing the names of FUNB's customers.

## 6. General Terms

This Agreement shall be binding upon and inure to the exclusive benefit of the parties hereto and their respective successors and permitted assigns, shall be governed by the law (and not the law of conflicts) of the State of New York, may be amended only by written agreement of the parties, and except as otherwise provided herein, is the entire agreement and understanding of the parties as to its subject matter. Rights and remedies hereunder are cumulative and not exclusive of any available either by law or under any other written agreement between the parties; any failure or delay in exercising any right or remedy is not a waiver thereof; a single or partial exercise of any right or remedy will not preclude any further exercise thereof; and any purported transfer of rights or obligations under this Agreement without the other party's written consent is void.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof. This Agreement is dated as of
_APRIL 6, 2000_

FIRST UNION NATIONAL BANK

By: _Alicia Rodriguez_

Name:  Alicia Rodriguez
Title:  Assistant Vice President

SUBSCRIBER:
CASA DE CAMPO MAJAPARA SA DE CV
[NAME OF PARTY]

By: _____

Name:
Title:

3

**B**



Wachovia Bank, N.A.
Attn: Foreign Exchange, NC-0675
1525 West WT Harris Blvd,1B1-1 East
Charlotte, NC 28262
Phone (800) 659-1697
Fax (704) 715-0082
Swift: PNBPUS3CHFX

MAJAPARA CASA DE CAMBIO - MEXICO                    Date:
LAGO MARGARITA NO. 16                                          December 11, 2007
MEXICO CITY, MEXICO 11520

Wachovia confirms the following:Spot Deal                    Deal Source:              EFOREX

| | | |
|---|---|---|
| Deal Number: | 8347911 | |
| Sequence Number: | 0 | |
| | | |
| Trade Date: | December 05, 2007 | |
| Value Date: | December 07, 2007 | |
| | | |
| MAJAPARA CASA DE CAMBIO - MEXICO buys: | 5,000,000.00 | EUR |
| MAJAPARA CASA DE CAMBIO - MEXICO sells: | 7,332,500.00 | USD |
| Rate: | 1.46650000 | |

Wachovia confirms the settlement instructions for the above referenced transaction as follows:

| | | |
|---|---|---|
| Wachovia Delivers: | 5,000,000.00 | EUR |
| | Account Name: | BAYERISCHE LANDESBK-MUNICH, GERMANY |
| | Account Number: | |
| | Payment Method: | By Outgoing Wire Payment |
| | Pay To: | BAYERISCHE HYPO-UND VEREINSBANK AG MUNICH GERMANY MUNICH GERMANY |
| | Account: | /DE10700202705803611035 |
| | For Account Of: | MAJAPARA CASA DE CAMBIO SA DE CV |
| | Intermediary Bank: | |
| | Sender to Receiver Information: | |
| | | |
| | Detailed Information: | |
| | | BO CASA DE CAMBIO MAJAPARA SA DE CV |
| Wachovia Receives: | 7,332,500.00 | USD |
| | Account number: | PHILNY |
| | Payment Method: | By Incoming International Payment |
| | Pay to: | WACHOVIA BANK N.A.-NEW YORK |

---

## Notify Wachovia Immediately If Not In Agreement:

---

WE HAVE REVIEWED AND AGREE TO THE TERMS OF THIS CONFIRMATION.
Thank you for your business.



Wachovia Bank, N.A.
Attn: Foreign Exchange, NC-0675
1525 West WT Harris Blvd,1B1-1 East
Charlotte, NC 28262
Phone (800) 659-1697
Fax (704) 715-0082
Swift: PNBPUS3CHFX

MAJAPARA CASA DE CAMBIO - MEXICO                      Date:              December 11, 2007
LAGO MARGARITA NO. 16
MEXICO CITY, MEXICO 11520

Wachovia confirms the following:Spot Deal                    Deal Source:           EFOREX

| | |
|---|---|
| Deal Number: | 8347951 |
| Sequence Number: | 0 |

| | | |
|---|---|---|
| Trade Date: | December 05, 2007 | |
| Value Date: | December 07, 2007 | |
| MAJAPARA CASA DE CAMBIO - MEXICO buys: | 1,000,000.00 | EUR |
| MAJAPARA CASA DE CAMBIO - MEXICO sells: | 1,466,500.00 | USD |
| Rate: | 1.46650000 | |

Wachovia confirms the settlement instructions for the above referenced transaction as follows:

| | | |
|---|---|---|
| Wachovia Delivers: | 1,000,000.00 | EUR |
| | Account Name: | BAYERISCHE LANDESBK-MUNICH, GERMANY |
| | Account Number: | |
| | Payment Method: | By Outgoing Wire Payment |
| | Pay To: | BAYERISCHE HYPO-UND VEREINSBANK AG MUNICH GERMANY MUNICH GERMANY |
| | Account: | /DE10700202705803611035 |
| | For Account Of: | MAJAPARA CASA DE CAMBIO SA DE CV |
| | Intermediary Bank: | |
| | Sender to Receiver Information: | |

| | | |
|---|---|---|
| | Detailed Information: | |
| | | BO CASA DE CAMBIO MAJAPARA SA DE CV |
| Wachovia Receives: | 1,466,500.00 | USD |
| | Account number: | PHILNY |
| | Payment Method: | By Incoming International Payment |
| | Pay to: | WACHOVIA BANK N.A.-NEW YORK |

## Notify Wachovia Immediately If Not In Agreement:

WE HAVE REVIEWED AND AGREE TO THE TERMS OF THIS CONFIRMATION.
Thank you for your business.



Wachovia Bank, N.A.
Attn: Foreign Exchange, NC-0675
1525 West WT Harris Blvd,1B1-1 East
Charlotte, NC 28262
Phone (800) 659-1697
Fax (704) 715-0082
Swift: PNBPUS3CHFX

MAJAPARA CASA DE CAMBIO - MEXICO
LAGO MARGARITA NO. 16                                    Date:
MEXICO CITY, MEXICO 11520                                       December 12, 2007

Wachovia confirms the following:Spot Deal              Deal Source:              EFOREX

| | | |
|---|---|---|
| Deal Number: | 8348101 | |
| Sequence Number: | 0 | |
| | | |
| Trade Date: | December 05, 2007 | |
| Value Date: | December 07, 2007 | |
| | | |
| MAJAPARA CASA DE CAMBIO - MEXICO buys: | 2,000,000.00 | EUR |
| MAJAPARA CASA DE CAMBIO - MEXICO sells: | 2,934,400.00 | USD |
| Rate: | 1.46720000 | |

Wachovia confirms the settlement instructions for the above referenced transaction as follows:

| | | |
|---|---|---|
| Wachovia Delivers: | 2,000,000.00 | EUR |
| | Account Name: | BAYERISCHE LANDESBK-MUNICH, GERMANY |
| | Account Number: | |
| | Payment Method: | By Outgoing Wire Payment |
| | Pay To: | BAYERISCHE HYPO-UND VEREINSBANK AG MUNICH GERMANY MUNICH GERMANY |
| | Account: | /DE10700202705803611035 |
| | For Account Of: | MAJAPARA CASA DE CAMBIO SA DE CV |
| | Intermediary Bank: | |
| | Sender to Receiver Information: | |

| | | |
|---|---|---|
| | Detailed Information: | |
| | | BO CASA DE CAMBIO MAJAPARA SA DE CV |
| Wachovia Receives: | 2,934,400.00 | USD |
| | Account number: | PHILNY |
| | Payment Method: | By Incoming International Payment |
| | Pay to: | WACHOVIA BANK N.A.-NEW YORK |

---

## Notify Wachovia Immediately If Not In Agreement:

---

WE HAVE REVIEWED AND AGREE TO THE TERMS OF THIS CONFIRMATION.
Thank you for your business.



Wachovia Bank, N.A.
Attn: Foreign Exchange, NC-0675
1525 West WT Harris Blvd,1B1-1 East
Charlotte, NC 28262
Phone (800) 659-1697
Fax (704) 715-0082
Swift: PNBPUS3CHFX

MAJAPARA CASA DE CAMBIO - MEXICO                    Date:            December 11, 2007
LAGO MARGARITA NO. 16
MEXICO CITY, MEXICO 11520

Wachovia confirms the following:Spot Deal                Deal Source:            EFOREX

    Deal Number:                        8347764
    Sequence Number:                    0

    Trade Date:                         December 05, 2007
    Value Date:                         December 07, 2007

    MAJAPARA CASA DE CAMBIO - MEXICO buys:    5,000,000.00        EUR
    MAJAPARA CASA DE CAMBIO - MEXICO sells:   7,333,000.00        USD
    Rate:                               1.46660000

Wachovia confirms the settlement instructions for the above referenced transaction as follows:

Wachovia Delivers:      5,000,000.00        EUR
                        Account Name:       BAYERISCHE LANDESBK-MUNICH,
                                            GERMANY
                        Account Number:
                        Payment Method:     By Outgoing Wire Payment
                        Pay To:             BAYERISCHE HYPO-UND VEREINSBANK AG
                                            MUNICH GERMANY
                                            MUNICH GERMANY
                        Account:            /DE10700202705803611035
                        For Account Of:     MAJAPARA CASA DE CAMBIO SA DE CV
                        Intermediary Bank:
                        Sender to Receiver Information:


                        Detailed Information:
                                            BO CASA DE CAMBIO MAJAPARA SA DE CV

Wachovia Receives:      7,333,000.00        USD
                        Account number:     PHILNY
                        Payment Method:     By Incoming International Payment
                        Pay to:             WACHOVIA BANK N.A.-NEW YORK

+-----------------------------------------------------------------+
| Notify Wachovia Immediately If Not In Agreement:                |
+-----------------------------------------------------------------+

WE HAVE REVIEWED AND AGREE TO THE TERMS OF THIS CONFIRMATION.
Thank you for your business.



Wachovia Bank, N.A.
Attn: Foreign Exchange, NC-0675
1525 West WT Harris Blvd,1B1-1 East
Charlotte, NC 28262
Phone (800) 659-1697
Fax (704) 715-0082
Swift: PNBPUS3CHFX

MAJAPARA CASA DE CAMBIO - MEXICO
LAGO MARGARITA NO. 16
MEXICO CITY, MEXICO 11520

Date:          December 11, 2007

Wachovia confirms the following:Spot Deal          Deal Source:          DIRECT

| | | |
|---|---|---|
| Deal Number: | 8347811 | |
| Sequence Number: | 0 | |
| Trade Date: | December 05, 2007 | |
| Value Date: | December 07, 2007 | |
| MAJAPARA CASA DE CAMBIO - MEXICO buys: | 5,000,000.00 | EUR |
| MAJAPARA CASA DE CAMBIO - MEXICO sells: | 7,338,000.00 | USD |
| Rate: | 1.46760000 | |

Wachovia confirms the settlement instructions for the above referenced transaction as follows:

| | | |
|---|---|---|
| Wachovia Delivers: | 5,000,000.00 | EUR |
| | Account Name: | BAYERISCHE LANDESBK-MUNICH, GERMANY |
| | Account Number: | |
| | Payment Method: | By Outgoing Wire Payment |
| | Pay To: | BAYERISCHE HYPO-UND VEREINSBANK AG MUNICH GERMANY MUNICH GERMANY |
| | Account: | /DE10700202705803611035 |
| | For Account Of: | MAJAPARA CASA DE CAMBIO SA DE CV |
| | Intermediary Bank: | |
| | Sender to Receiver Information: | |

| | | |
|---|---|---|
| | Detailed Information: | |
| | | BO CASA DE CAMBIO MAJAPARA SA DE CV |
| Wachovia Receives: | 7,338,000.00 | USD |
| | Account number: | PHILNY |
| | Payment Method: | By Incoming International Payment |
| | Pay to: | WACHOVIA BANK N.A.-NEW YORK |

## Notify Wachovia Immediately If Not In Agreement:

WE HAVE REVIEWED AND AGREE TO THE TERMS OF THIS CONFIRMATION.
Thank you for your business.



Wachovia Bank, N.A.
Attn: Foreign Exchange, NC-0675
1525 West WT Harris Blvd,1B1-1 East
Charlotte, NC 28262
Phone (800) 659-1697
Fax (704) 715-0082
Swift: PNBPUS3CHFX

MAJAPARA CASA DE CAMBIO - MEXICO                      Date:          December 11, 2007
LAGO MARGARITA NO. 16
MEXICO CITY, MEXICO 11520

Wachovia confirms the following:Spot Deal                 Deal Source:              EFOREX

| | | |
|---|---|---|
| Deal Number: | 8347860 | |
| Sequence Number: | 0 | |
| Trade Date: | December 05, 2007 | |
| Value Date: | December 07, 2007 | |
| MAJAPARA CASA DE CAMBIO - MEXICO buys: | 3,000,000.00 | EUR |
| MAJAPARA CASA DE CAMBIO - MEXICO sells: | 4,398,300.00 | USD |
| Rate: | 1.46610000 | |

Wachovia confirms the settlement instructions for the above referenced transaction as follows:

| | | |
|---|---|---|
| Wachovia Delivers: | 3,000,000.00 | EUR |
| | Account Name: | BAYERISCHE LANDESBK-MUNICH, GERMANY |
| | Account Number: | |
| | Payment Method: | By Outgoing Wire Payment |
| | Pay To: | BAYERISCHE HYPO-UND VEREINSBANK AG MUNICH GERMANY MUNICH GERMANY |
| | Account: | /DE10700202705803611035 |
| | For Account Of: | MAJAPARA CASA DE CAMBIO SA DE CV |
| | Intermediary Bank: | |
| | Sender to Receiver Information: | |

| | | |
|---|---|---|
| | Detailed Information: | |
| | | BO CASA DE CAMBIO MAJAPARA SA DE CV |
| Wachovia Receives: | 4,398,300.00 | USD |
| | Account number: | PHILNY |
| | Payment Method: | By Incoming International Payment |
| | Pay to: | WACHOVIA BANK N.A.-NEW YORK |

## Notify Wachovia Immediately If Not In Agreement:

WE HAVE REVIEWED AND AGREE TO THE TERMS OF THIS CONFIRMATION.
Thank you for your business.



Wachovia Bank, N.A.
Attn: Foreign Exchange, NC-0675
1525 West WT Harris Blvd,1B1-1 East
Charlotte, NC 28262
Phone (800) 659-1697
Fax (704) 715-0082
Swift: PNBPUS3CHFX

MAJAPARA CASA DE CAMBIO - MEXICO                        Date:
LAGO MARGARITA NO. 16                                   December 12, 2007
MEXICO CITY, MEXICO 11520

Wachovia confirms the following:Spot Deal          Deal Source:          EFOREX

| | |
|---|---|
| Deal Number: | 8347871 |
| Sequence Number: | 0 |

| | | |
|---|---|---|
| Trade Date: | December 05, 2007 | |
| Value Date: | December 07, 2007 | |
| MAJAPARA CASA DE CAMBIO - MEXICO buys: | 5,000,000.00 | EUR |
| MAJAPARA CASA DE CAMBIO - MEXICO sells: | 7,330,000.00 | USD |
| Rate: | 1.46600000 | |

Wachovia confirms the settlement instructions for the above referenced transaction as follows:

| | | |
|---|---|---|
| Wachovia Delivers: | 5,000,000.00 | EUR |
| | Account Name: | BAYERISCHE LANDESBK-MUNICH, GERMANY |
| | Account Number: | |
| | Payment Method: | By Outgoing Wire Payment |
| | Pay To: | BAYERISCHE HYPO-UND VEREINSBANK AG |
| | | MUNICH GERMANY |
| | | MUNICH GERMANY |
| | Account: | /DE10700202705803611035 |
| | For Account Of: | MAJAPARA CASA DE CAMBIO SA DE CV |
| | Intermediary Bank: | |
| | Sender to Receiver Information: | |

| | | |
|---|---|---|
| | Detailed Information: | |
| | | BO CASA DE CAMBIO MAJAPARA SA DE CV |
| Wachovia Receives: | 7,330,000.00 | USD |
| | Account number: | PHILNY |
| | Payment Method: | By Incoming International Payment |
| | Pay to: | WACHOVIA BANK N.A.-NEW YORK |

## Notify Wachovia Immediately If Not In Agreement:

WE HAVE REVIEWED AND AGREE TO THE TERMS OF THIS CONFIRMATION.
Thank you for your business.