**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| WACHOVIA BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 CV 170 |
| v. | ) | |
| | ) | Honorable Amy J. St. Eve |
| CASA de CAMBIO | ) | |
| MAJAPARA S.A. de C.V. and | ) | **ANSWER and COUNTERCLAIMS** |
| JOM CORPORATION OF | ) | |
| ILLINOIS, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| Harris N.A., a National Association, | ) | |
| | ) | |
| Garnishee. | ) | |

Defendant Casa de Cambio Majapara S.A. de C.V. ("Majapara"), by its attorneys

Sperling & Slater, P.C., for its answer and counterclaims to the Complaint filed by Plaintiff,

Wachovia Bank, N.A. ("Wachovia"), states as follows:

**PRELIMINARY STATEMENT**

1.      This action arise from Majapara's misappropriation of over $38 million (US$) of
Wachovia's money relating to a series of foreign exchange spot transactions
between the parties. Foreign exchange spot transactions, due to their frequency,
the speed at which the transactions are agreed and closed, and the manner in
which funds are simultaneously exchanged, are founded upon trust. Majapara,
however, abused that trust – a trust that was established through years of currency
trading with Wachovia – to plunder more than $38 Million from Wachovia.

**Response:**    As a result of Wachovia's unwarranted and wrongful actions, Majapara's entire

business has been destroyed and over 600 Majapara employees are out of work.

After having done business with Majapara for over ten years, Wachovia, without cause

and without advance notice, terminated all operating credit facilities extended to Majapara.

1

Less than ten days after this termination, Wachovia filed two lawsuits against Majapara seeking *ex parte* prejudgment attachments and an injunction. Wachovia knew that in such *ex parte* proceedings the Courts would necessarily have to trust Wachovia to make full and fair disclosure of all facts material to the Courts because – of course – Majapara would not be there. Wachovia took this opportunity, instead, to withhold material facts from the Court, assuring that the Courts would grant Wachovia the injunction and attachments that it sought.

Although Wachovia claimed that Majapara had not paid it $38 million that it owed for certain foreign exchange transactions, Wachovia did not disclose to the Courts the reason Majapara could not pay – because Wachovia had terminated Majapara's operating facilities without cause and without notice. Wachovia did not disclose to the Courts that just months earlier it had induced Majapara to move business Majapara was doing with Harris Bank to Wachovia. Wachovia did not disclose to the Courts information showing that the withdrawals of funds by Majapara from its Wachovia account – withdrawals that Wachovia claimed were intended to frustrate any attempts by Wachovia to collect its debt – were, in fact, done in the ordinary course of Majapara's business.

Wachovia breached its contractual duties to Majapara, tortiously interfered with Majapara's relations with other banks, and then wrongfully obtained an injunction and attachments from two Courts. Wachovia's actions not only violate the law, but also fundamental principles of justice, equity, and good conscience. For the substantial losses Majapara has suffered at the hands of Wachovia, Majapara seeks redress including an award of compensatory damages, and punitive damages which are definitely warranted in this case.

Majapara denies the remaining allegations of this paragraph.

2.    Majapara's action was not a mere renege on a multi-million dollar transaction wherein Majapara returned Wachovia's property when it realized it could not

complete the foreign currency exchange. Subsequent conversations with Majapara make apparent that it never intended to honor its commitments but, instead, had decided to wrongfully keep Wachovia's money and abscond with it. In these after-the-fact conversations, Majapara admitted to Wachovia that it was illiquid, that it had engaged in illicit activities in relation to its foreign exchange transactions and threatened that, if Wachovia took any steps to enforce its rights, Wachovia's judgment would be uncollectible. Through this action for breach of contract, promissory estoppel, unjust enrichment, fraud, and alter ego liability, Wachovia seeks a judgment against Majapara and JOM Corporation of Illinois (as alter ego of Majapara) for $24,711, 845.00 (the amount of Wachovia's loss less offsets currently obtained), plus prejudgment interest and costs.

**Response:**     See response to paragraph 1.

## **PARTIES AND JURISDICTION**

3.     Wachovia is a national banking association, with its principal place of business in Charlotte, North Carolina. Wachovia has offices in Illinois.

**Response:**   Admitted.   Wachovia also maintains offices in many other locations, including Miami, New York, and Mexico City.

4.     Upon information and belief, Majapara is a Mexican corporation with its principal place of business in Mexico City, Mexico.   Upon information and belief, Defendant Majapara utilizes a bank account at a Chicago branch of Harris N.A. to transact business and it transacts business in Illinois on a continuous and systematic basis.   Further, upon information and belief, Defendant Majapara transacts business on a continuous and systematic basis through an alter ego, Defendant JOM Corporation of Illinois ("JOM"), which is or was an Illinois corporation with its principal place of business at 3506 W. 26th Street in Chicago, Illinois.

**Response:** Majapara admits that it is a Mexican business with offices throughout Mexico.   Majapara's main office is located in Mexico City.   In all other respects, Majapara denies the allegations of this paragraph.   JOM Corporation of Illinois ("JOM Illinois") ceased to exist on or about December 29, 2006.

5.     Upon information and belief, JOM voluntarily dissolved on or about December 29, 2006, but still transacts business.   Upon information and belief, JOM transacts business as Majapara.

3

**Response:**  Majapara admits that JOM Illinois ceased to exist on or about December 29, 2006 when it voluntarily dissolved and was merged into JOM Corporation.  In all other respects, Majapara denies the allegations of this paragraph.

> 6.    Upon information and belief, Garnishee Harris N.A. ("Harris Bank") is an Illinois national banking association with its principal place of business in Chicago, Illinois.

**Response**:  Because Majapara has insufficient knowledge or information to form a belief as to the truth of this allegation, Majapara denies the allegations of this paragraph.

> 7.    Jurisdiction is appropriate in this case pursuant to 735 ILCS 5/2-209.

**Response:**  Denied.

> 8.    Venue is appropriate in this case pursuant to 735 ILCS 5/2-101 because Defendant JOM is an Illinois corporation who, upon information and belief, has or had its principal place of business in Cook County and part of the transactions herein arose in Cook County.

**Response:**  Denied.

## FACTS COMMON TO ALL COUNTS

### The Majapara Relationship With Wachovia

> 9.    In the late 1990's Majapara and First Union National Bank ("First Union"), a predecessor to Wachovia, agreed to enter into foreign exchange transactions together. In these transactions, Majapara would agree to purchase from First Union a certain amount of one currency in exchange for Majapara selling to First Union a certain amount of another currency at the applicable exchange rate.

**Response:**  For over ten years, Majapara has been doing business with Wachovia and its predecessor, First Union.  As part of that business relationship, Majapara had credit available through overdraft privileges, the ability to submit unlimited remittances to Wachovia for processing among others (collectively the "operating facilities").  These operating facilities had existed for many years.

Majapara denies the remaining allegations of this paragraph.

10. In order to facilitate Majapara and First Union entering into these currency exchange transactions, on or about April 6, 2000, Majapara and First Union entered into a First Union Online FX Subscription Agreement (the "FX Subscription Agreement"), a copy of which is attached hereto as Exhibit A. Pursuant to the FX Subscription Agreement, Majapara was permitted to execute foreign exchange transactions electronically with First Union through First Union's foreign exchange website. This, however, was not the exclusive method for the parties to enter into these foreign exchange spot transactions.

**Response:** After years of doing business with First Union, First Union developed an online website through which FX transactions could be placed. In order to use its new website, First Union asked Majapara to sign the First Union Online FX Subscription Agreement ("Online FX Agreement"). The Online FX Agreement does not purport to set terms relating to FX transactions beyond online transactions. Those terms were what they had always been between Majapara and First Union. By its own terms, the Online FX Agreement limited its application to the use of the First Union website to place FX transaction orders. While the Online FX Agreement provides that First Union reserves the right without notice to modify, suspend, discontinue, or terminate the FX website or revoke any customer's access, it expressly states that the parties' rights and obligations concerning online and other transactions shall not be impaired or otherwise affected by such actions.

Majapara denies the remaining allegations of this paragraph.

11. Effective April 1, 2002, Wachovia merged into and under the charter of First Union with the resulting title of Wachovia Bank, National Association. As a result of the merge, First Union changed its name to Wachovia Bank, National Association. As a result of the merger, the FX Subscription Agreement was assigned to Plaintiff Wachovia.

**Response:** Because Majapara is without sufficient knowledge or information to form a belief as the truth of the allegations in this paragraph, Majapara denies those allegations.

**The Foreign Exchange Transactions At Issue**

12. On or about December 5, 2007, Majapara and Wachovia agreed to a series of seven (7) transactions, all of which were to settle on December 7, 2007, whereby Wachovia would deliver an aggregate 26 million Euros to Majapara and Majapara would deliver in aggregate $38,132,700 to Wachovia. These transactions required Majapara to transfer dollars directly to a Wachovia account located in New York. Six (6) of the transactions were executed on Wachovia's foreign exchange internet website. One (1) of the transactions was executed over the telephone. Copies of the confirmations for these transactions are attached hereto as Exhibit B.

**Response:**    Majapara admits the allegations of the first sentence of paragraph 12.  Majapara denies the remaining allegations of this paragraph.

13. Pursuant to these seven (7) foreign exchange agreement, on December 7, 2007, Wachovia delivered 26 million Euros to Majapara. Majapara failed to deliver the agreed upon $38,132,700.00 to Wachovia, as required, on December 7, 2007.

**Response:**  Majapara placed FX transaction orders on December 5, 2007.  Wachovia delivered 26 million Euros to Majapara.  Because of Wachovia's breach of its contract with Majapara, Wachovia prevented Majapara from being able to make its payment to Wachovia on December 7.  Majapara denies the remaining allegations of this paragraph.

14. On or about December 13, 2007, the General Director of Majapara admitted that Majapara had been obligated to provide the agreed upon currency to Wachovia.

**Response:**  Denied.

15. Despite its failure to pay Wachovia for the over $38 million worth of Euros that Wachovia sent to Majapara, Majapara tried to place additional trades with Wachovia on December 7, 2007, knowing that it could not cover additional trades or its existing obligation to deliver the dollars.  Wachovia was able to stop such additional trades from being executed.

**Response:**  Denied.

16. Moreover on December 11, 2007, after refusing to pay Wachovia over $38 million for the exchange, Majapara sought to drain an account held at Wachovia by attempting to transfer over $9 million out of the account.

**Response:** Denied.

    17. By opening an account at Wachovia, Majapara agreed to Wachovia's Terms & Conditions for Global Financial Institutions, which, under its terms, grants Wachovia setoff rights. <u>See</u> Terms and Conditions attached hereto as Exhibit C. Through its setoff rights, Wachovia was able to secure $13, 420, 155, which came into Majapara's accounts at Wachovia, but has not been able to recover the remaining amount Wachovia is owed. Some of the amount recovered represents conditional credit that may be subject to reduction by reason of return of the items (in this case, checks) for which this credit was given (<u>see</u> next Paragraph).

**Response**:  Majapara states that the Wachovia Terms and Conditions do not purport to cover FX transactions.  Answering further, Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's accounts at Wachovia, but denies that Wachovia had any right to "secure" those funds or to "recover" any amounts purportedly "owed."  Majapara denies the remaining allegations of this paragraph.

    18. Majapara also maintains five (5) U.S. dollar accounts with Wachovia. As to each of these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program. Majapara is obligated to reimburse Wachovia for these amounts, but has now stated it is unable to and will not meet its financial obligations. This liability has averaged $3.3 million per month for the last several months.

**Response**:  Majapara admits that it maintained five accounts with Wachovia.  Majapara denies the remaining allegations of this paragraph.

### JOM Is The Alter Ego of Majapara

    19. JOM is or was an Illinois corporation which, upon information and belief, had its principal place of business in Chicago, Illinois.

**Response**:  Denied.  JOM Corporation of Illinois ("JOM Illinois") transacted business in Illinois until it was dissolved on or about December 29, 2006.  That dissolution took place long before any of the events which are the subject of Wachovia's lawsuits.  JOM Illinois was merged into JOM Corporation, a Texas corporation with its principal place of business in California.

20. Illinois Secretary of State records show that JOM was voluntarily dissolved on or about December 29, 2006.  A copy of the Secretary of State records is attached hereto as Exhibit D.

**Response:**  JOM Illinois transacted business in Illinois until it was dissolved on or about December 29, 2006.  Majapara denies the remaining allegations of this paragraph.

21. Upon information and belief, JOM and Majapara have common officers and/or directors.

**Response:**  Denied.  JOM Illinois no longer exists, so it no longer has any officers or directors.

22. Upon information and belief, "JOM" stands for "Jorge Ortiz Munos," who is Majapara's Chairman and CEO.

**Response:**     Majapara admits that Jorge Ortiz is Majapara's Chairman and CEO.  J-O-M are Mr. Ortiz's initials.  Majapara denies the remaining allegations of this paragraph.

23. Upon information and belief, JOM and Majapara have one or more common owners and/or JOM is a subsidiary of Majapara.

**Response:**     Majapara admits that Jorge Ortiz is a shareholder of Majapara and also a shareholder of JOM Corporation.  Majapara denies the remaining allegations of this paragraph.

24. According to the Illinois Secretary of State records, JOM used the Assumed Name of "Majapara-Chicago."

**Response:**     Majapara admits that JOM Illinois would from time to time use the trade name of Majapara in its business because of its value in the marketplace.  JOM Illinois did this with Majapara's permission.  JOM Illinois did not hold itself out as Majapara.

25. Although JOM was dissolved approximately a year ago, upon information and belief, it is still engaging in business.

**Response**:     Denied.

26. In fact, in October and November 2007, JOM (a dissolved corporation according to Illinois Secretary of State records) transferred $5,615,666 from its Harris Bank account (entitled, upon information and belief, "JOM Corp of Illinois DBA Majapara-Chicago) directly to a Majapara account at Wachovia.

**Response:**    Denied.  After JOM Illinois was merged into JOM Corporation, Harris Bank and others were notified and the proper filings were made with the Illinois Secretary of State.  After the merger, JOM Corporation commenced using the Harris Bank account that had been opened by and previously used by JOM Illinois.

Harris Bank did not update its internal records to reflect that the account now was owned by JOM Corporation.  JOM Corporation used the account at Harris Bank for its own business transactions with a number of different counterparties, including Majapara.  JOM Corporation had a business relationship with Majapara whereby Majapara would provide certain services to JOM Corporation and JOM Corporation would pay for those services.  In providing those services, JOM Corporation was authorized to use the name of Majapara or "MAS" because it was a valuable trade name.  Although JOM Corporation did not do business as Majapara, it did use the trade name of Majapara.

27. Documentation reflecting one such recent transfer from JOM to Majapara is attached at Exhibit E.

**Response:**    Denied.  JOM Corporation routinely paid transaction fees to Majapara for payment for money transfers remitted through Majapara paymasters.  JOM Corporation also routinely purchased pesos from Majapara, among others.

28. Upon information and belief, JOM is an alter ego of Majapara and JOM's assets, accordingly, can be utilized to satisfy Majapara's debts to Wachovia.

**Response:**    Denied.

## COUNT I
### (Breach of Contract)

29. Plaintiff realleges and reincorporates the allegations in Paragraphs 1 through 28.

**Response:**  Majapara incorporates its responses to paragraphs 1 through 28 above.

30. As set forth above, Wachovia entered into a series of currency exchange agreements with Majapara.

**Response:**  On each business day for many years, Majapara would enter into millions of dollars of FX transactions with Wachovia.  Each of those individual transactions took place in the context of the overall contractual relationship between Wachovia and Majapara.  That contractual relationship is evidenced by the course of dealing between the parties over many years and the custom and practice in the foreign exchange business.  On the basis of that contractual relationship, Majapara reasonably believed that should Wachovia decide to terminate Majapara's operating facilities, Wachovia would provide reasonable notice so that Majapara would have time to move its business to another bank.  Wachovia breached its contractual duty to Majapara by terminating Majapara's operating facilities without cause and without providing Majapara any advance notice whatsoever.  Wachovia's breach caused significant disruption to Majapara's business because Majapara was left with no advance notice during which it could arrange for a substitute bank for its business.  Except as so stated, Majapara denies the allegations contained in this paragraph.

31. Majapara breached those agreements by failing to deliver the currency as agreed upon by the parties.

**Response:** Denied.

32. Wachovia has fulfilled its obligations under the agreements.

**Response:** Denied.

33. As a result of Majapara's breaches, Wachovia has suffered damage in the amount of not less than $24,711,845.00, plus interest, plus the amount of any contingent residual exposure as set forth in Paragraph 18 above.

**Response:** Denied.

## COUNT II
## (Promissory Estoppel – Alternate Count)

34. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

**Response:** Majapara incorporates its responses to paragraphs 1 through 28 above.

35. In the event it is found that no oral or written contract exist between Majapara and Wachovia in relation to the seven (7) foreign exchange spot transactions at issue here, equity intervenes, creating the necessary consideration to support an agreement requires Majapara to pay Wachovia not less than $24,711,845.00 in return for accepting currency from Wachovia.

**Response:**  Denied.

36. Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

**Response:** On December 5, when Majapara placed the orders for the FX transactions, Majapara had every intention and expectation that these transactions would take place just as they had for more than ten years.  Wachovia would provide Majapara with one currency and Majapara would provide Wachovia with the other one or two days later.  Wachovia's improper cancellation of Majapara's operating facilities however, frustrated Majapara's intention and expectation.  Majapara denies all other allegations in this paragraph.

37. In reliance to Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

**Response**:   Majapara admits that Wachovia delivered approximately $38 million worth of currency to Majapara, but denies that Wachovia did so in reliance upon Majpara's agreement to deliver certain currency to Wachovia.  Majapara denies all other allegations of this paragraph.

38. Wachovia has requested the funds from Majapara.

**Response:**  Wachovia demanded that the funds be paid in full immediately. By virtue of its inequitable conduct Wachovia had no right to demand payment from Majapara on December 7.

39. To date Majapara has not provided the required currency to Wachovia.

**Response:**  Denied.

40. Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

**Response:**  Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's accounts at Wachovia, but denies that Wachovia had any right to "obtain" these funds, or to "offset" any remaining amount purportedly "owed."  Majapara denies the remaining allegations of this paragraph.

41. Wachovia has no adequate remedy at law.

**Response:**  Denied.

42. As a result, Majapara has been unjustly enriched to the detriment of Wachovia.

**Response:**  Denied.

## COUNT III
### (Unjust Enrichment – Alternate Count)

43. Plaintiff realleges and reincorporate the allegations in Paragraphs 1 through 28.

**Response:**      Majapara incorporates its responses to paragraphs 1 through 28 above.

44. In the event it is found that no oral or written contracts existed between Majapara and Wachovia in relation to the seven (7) foreign exchange transactions at issue here, equity would still require Majapara to pay Wachovia an amount not less than $24,711,845.00 in return for accepting currency from Wachovia.

**Response:**  Denied.

45. Majapara promised to deliver certain currency to Wachovia in return for Wachovia delivering certain currency to Majapara.

**Response:** Denied.  See response to paragraph 36.

46. In reliance on Majapara's agreement to deliver certain currency to Wachovia, Wachovia delivered approximately $38 million worth of currency to Majapara.

**Response:**  On December 5, when Majapara placed the orders for the FX transactions, Majapara had every intention and expectation that these transactions would take place just as they had for more than ten years.  Wachovia would provide Majapara with one currency, and Majapara would provide Wachovia with the other one or two days later.  Wachovia's improper cancellation of Majapara's operating facilities, however, frustrated Majapara's intention and expectation.  Accordingly, Majapara denies the allegations contained in this paragraph.

47. Majapara did not deliver any currency to Wachovia.

**Response:** Denied.

48. Wachovia, however, has been able to obtain certain Majapara funds and offset the amount owed by $13,420,155.00 (subject to reduction for the reasons set forth in Paragraph 14 of the recitals above).

**Response:**  Majapara admits that Wachovia seized approximately $13.4 million that was in Majapara's account at Wachovia, but denies that Wachovia had any right to "obtain" these funds, or to "offset" any remaining amount purportedly "owed".  Accordingly, Majapara denies the allegations contained in this paragraph.

49. Wachovia requested that Majapara deliver the currency it is owed.

**Response:**  Wachovia demanded that the funds be paid in full immediately.  By virtue of its inequitable conduct, Wachovia had no right to demand payment from Majapara on December 7.  Accordingly, Majapara denies the allegations contained in this paragraph.

50. To date, Majapara has neither delivered the required currency to Wachovia, nor returned return the currency Wachovia sent to it.

**Response:**  Denied.

51. Majapara has unjustly retained this benefit to the detriment of Wachovia.

**Response:** Denied.

52. Majapara's retention of this benefit violates fundamental principles of justice, equity and good conscience.

**Response:** Denied.

53. Wachovia has no adequate remedy at law.

**Response:** Denied.

## COUNT IV
### (<u>Fraud</u>)

54. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

**Response:** Majapara incorporates its responses to paragraphs 1 through 28 above.

55. As set forth above, on or about December 5, 2007 Majapara and Wachovia entered into series of seven (7) currency exchange transactions.

**Response:** Majapara placed orders for FX transactions on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Except as so stated, Majapara denies the allegations contained in this paragraph.

56. Pursuant to the parties' agreements, in exchange for the receipt of 26 million Euros from Wachovia, Majapara agreed to deliver $38,132,700.00 to Wachovia.

**Response:** Majapara placed orders for FX transactions on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Except as so stated, Majapara denies the allegations contained in this paragraph.

57. Upon information and belief, at the time Majapara entered into the December 5, 2007 agreement it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement.

**Response:** Majapara placed orders for FX transactions on December 5, 2007 in reliance upon its longstanding contractual relationship and course of dealing with Wachovia. Wachovia accepted those orders knowing that later that day Wachovia was going to terminate Majapara's operating facilities. Thus, at the time Majapara placed its December 5 orders with Wachovia it had no knowledge that Wachovia would later terminate its operating facilities. Except as so stated, Majapara denies the allegations contained in this paragraph.

58. Notwithstanding its knowledge, Majapara represented to Wachovia that it would deliver $38,132,700.00 (US$) to Wachovia to settle the transactions. Upon information and belief, at the time of the transaction, Majapara knew it would not deliver the required currency and was acting under a present intent to deceive Wachovia and abscond with its funds. Its representations to Wachovia were false and materially misleading. In forwarding the funds to Majapara, Wachovia had the right to rely on Majapara's representation

**Response:** Denied.

59. Majapara's fraudulent intent was confirmed in conversations Wachovia subsequently had with representatives of Majapara.

**Response:** Denied.

60. For example, on or about December 13, 2007, Carlos A. Perez, a Managing Director of Wachovia, spoke with Jorge Ortiz, the Chairman and CEO of Majapara by telephone, and Mr. Ortiz acknowledged that Majapara, prior to settlement of the transactions, knew that it was experiencing "a liquidity crisis." Mr. Ortiz stated that Majapara had received Wachovia's Euros and lent the money to third parties. When Mr. Perez confronted Mr. Ortiz concerning the transaction and the illegality of Majapara's actions, as a Casa de Cambio, under Mexican law Majapara is not permitted to make loans, Mr. Ortiz responded, "I recognize that I have done something that is not permitted."

**Response:** Denied.

61. Due to Majapara's "liquidity crisis" and other impermissible activities relating to its currency transactions, Majapara did not have sufficient funds to complete the exchange with Wachovia. Majapara nonetheless accepted Wachovia's funds, knowing that it would be incapable of repaying the funds to Wachovia.

**Response:**  Denied.

62. Majapara then claimed to have used some or all of the Wachovia funds to engage in impermissible lending transactions and otherwise dissipated the assets received from Wachovia, all the while failing to fulfill its immediate obligations to transfer over $38 million to Wachovia.

**Response:** Denied.

63. Wachovia entered into the transactions and delivered 26 million Euros to Majapara in reasonable reliance upon Majapara's representations that it was going to deliver the requisite currency.

**Response:** Denied.

64. As a result of Majapara's fraud, Wachovia has been damaged in an amount to be determined at trial, but not less than $24,711,845.00.

**Response:** Denied.

## COUNT V
## (Breach of Contract/Anticipatory Breach)

65. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

**Response:** Majapara incorporates its responses to paragraphs 1 through 28 above.

66. As set forth above, Majapara also maintains five (5) US dollar accounts at Wachovia. Under these accounts, Wachovia has contingent residual exposure to cover returned items in the federal check clearing program – this contingent liability is continuing concern. In this regard, Wachovia is entitled to immediate reimbursement from Majapara for the amounts Wachovia is required to pay out.

**Response:**   Majapara admits that it maintained five accounts with Wachovia, but denies the remaining allegations contained in this paragraph.

67. Over the last several months, this liability has averaged $3.3 million per month.

**Response:**  Because Majapara has no knowledge or information upon which to admit or deny this allegation, Majapara must deny it.

68. So far this month, Wachovia has already had to cover certain residual liabilities for which Majapara, in breach of its agreements with Wachovia, has not reimbursed Wachovia. As a result, Majapara breached the parities' agreement and is indebted to Wachovia.

**Response:**  Because Majapara has no information upon which to admit or deny the allegations of this paragraph, Majapara must deny them.

69. Additionally, Majapara has already stated to Wachovia that it is illiquid and unable to satisfy its obligations owed to Wachovia. Accordingly, Majapara has anticipatorily breached its agreement with Wachovia by stating it will not be immediately reimbursing Wachovia for these obligations now or when they come due.

**Response:** Denied.

70. Wachovia has performed all of its obligations under its agreements with Majapara.

**Response:** Denied.

71. Consequently, Wachovia has been damaged by Majapara's breach of the parties' agreement and will continue to be damaged by Majapara's anticipatory breach of the parties' agreement in an amount to be determined at trial.

**Response:** Denied.

### COUNT VI
### (Alter Ego Liability Against JOM)

72. Plaintiff realleges and reincorporates the allegations in Paragraph 1 through 28.

**Response:**     Majapara incorporates its responses to paragraphs 1 through 28 above.

73. Upon information and belief, there is such a unity of interest and ownership between Majapara and JOM that the separate corporate personalities should not longer be recognized.

**Response**:     Denied.

74. Adherence to the fiction of separate corporate existence would sanction fraud or promote injustice upon creditors, such as Wachovia.

**Response:**     Denied.

75. Upon information and belief, JOM is the alter ego of Majapara.

**Response:**     Denied.

76. As the alter ego of Majapara, JOM is liable for Wachovia for Majapara's liability to Wachovia under this Complaint.

**Response:**     Denied.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

### First Defense

Majapara incorporates by reference its Counterclaims in this matter. By reason of the matters set forth therein and the wrongs Wachovia has committed against Majapara – including Wachovia's breach of its contractual duties, obtaining a wrongful injunction and wrongful attachments – Wachovia is due no recovery here and its Complaint should be dismissed.

### Second Defense

Wachovia's claims against Majapara are barred in whole or in part by the doctrine of estoppel. Wachovia induced Majapara to give it most of Majapara's business by, among other things, the extension of the operating facilities from which Wachovia earned substantial fees over many years. Wachovia is estopped from claiming damages because it was Wachovia's termination of Majapara's operating facilities without cause and without notice that caused Majapara to be unable to pay Wachovia on December 7, and its falsely accusing Majapara of fraud and theft in order to obtain attachments and an injunction that destroyed Majapara's business.

### Third Defense

Wachovia's claims against Majapara are barred in whole or in part by the doctrine of unclean hands. Wachovia induced Majapara to give it most of Majapara's business by, among

other things, the extension of the operating facilities from which Wachovia earned substantial fees. Wachovia's termination of Majapara's operating facilities without cause and without notice caused Majapara to be unable to pay Wachovia on December 7, and its falsely accusing Majapara of fraud and theft in order to obtain attachments and an injunction that destroyed Majapara's business.

**Fourth Defense**

Wachovia's claims against Majapara are barred in whole or in part by Wachovia's failure to mitigate its damages.  As a result of Wachovia falsely accusing Majapara of fraud and theft, Majapara's business was destroyed, making Majapara unable to pay Wachovia for the outstanding FX transactions.

**Fifth Defense**

Wachovia's claims against Majapara are barred in whole or in part by the doctrine of duress.  Wachovia induced Majapara to give it most of Majapara's business, among other things, the extension of the operating facilities from which Wachovia earned substantial fees.  Wachovia knew that Majapara was dependent on these operating facilities.  Wachovia's termination of Majapara's operating facilities without cause and without notice left Majapara unable to pay Wachovia on December 7, and Wachovia's falsely accusing Majapara of fraud and theft in order to obtain attachments and an injunction caused Majapara's entire business to be destroyed.


Majapara hereby reserves the right to amend this Answer and Counterclaims to include additional defenses as they become known to Majapara.

## COUNTERCLAIMS

### Introduction and Nature of the Case

1.      As a result of Wachovia's unwarranted and wrongful actions, Majapara's entire business has been destroyed and over 600 Majapara employees are out of work.

2.      After having done business with Majapara for over ten years, Wachovia, without cause and without advance notice, terminated all operating credit facilities extended to Majapara.

3.      Less than ten days after this termination, Wachovia filed two lawsuits against Majapara seeking *ex parte* prejudgment attachments and an injunction.  Wachovia knew that in such *ex parte* proceedings the Courts would necessarily have to trust Wachovia to make full and fair disclosure of all facts material to the Courts because – of course – Majapara would not be there.  Wachovia took this opportunity, instead, to withhold material facts from the Court, assuring that the Courts would grant Wachovia the injunction and attachments that it sought.

4.  Although Wachovia claimed that Majapara had not paid it $38 million that it owed for certain foreign exchange transactions, Wachovia did not disclose to the Courts the reason Majapara could not pay – because Wachovia had terminated Majapara's operating facilities without cause and without notice.  Wachovia did not disclose to the Courts that just months earlier it had induced Majapara to move business Majapara was doing with Harris Bank to Wachovia.  Wachovia did not disclose to the Courts information showing that the withdrawals of funds by Majapara from its Wachovia account – withdrawals that Wachovia claimed were intended to frustrate any attempts by Wachovia to collect its debt – were, in fact, done in the ordinary course of Majapara's business.

5.  Wachovia breached its contractual duties to Majapara, tortiously interfered with Majapara's relations with other banks, and then wrongfully obtained an injunction and

attachments from two Courts.  Wachovia's actions not only violate the law, but also fundamental principles of justice, equity, and good conscience.  For the substantial losses Majapara has suffered at the hands of Wachovia, Majapara seeks redress including an award of compensatory damages, and punitive damages which are definitely warranted in this case.

**Parties, Jurisdiction, and Venue**

6.    Counterplaintiff Majapara began operations as foreign exchange bureau (casa de cambio) in 1989 and had grown by December 2007 to have over 600 employees and offices throughout Mexico.  Majapara has no offices outside of Mexico.  Its principal place of business is in Mexico City, Mexico.

7.    Upon information and belief, Counterdefendant Wachovia is a national banking association with its principal place of business in North Carolina and various offices in the U.S. and abroad, including New York, Illinois, and Mexico City.

8.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, and 12 U.S.C. § 632, in that this is a suit (i) of a civil nature at common law or in equity to which Wachovia, which is organized under the laws of the United States, is a party; and (ii) arising out of transactions involving international or foreign banking, or out of other international or foreign financial operations, and as such is deemed to arise under the laws of the United States.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen or subject of a foreign state.  This Court also has pendent jurisdiction over these counterclaims.

**General Allegations**

9.      Majapara has operated as a foreign exchange bureau (casa de cambio) in Mexico since 1989.  Majapara's business grew from a 17 person office to over 600 employees by December 2007.

10.      Majapara is subject to the regulation of the Mexican banking authorities.    In accordance with Mexican law, Majapara engaged in FX transactions and the purchase and sale of items like bill payment orders, checks, and drafts in foreign currencies.  Pursuant to Mexican law, Majapara was authorized to enter into transactions for the purchase and sale of these items that would settle up to two days later.  Thus, Majapara would accept checks drawn on U.S. banks from its customers and provide cash to the customers the same day.  Then Majapara would electronically transmit those checks to Wachovia.  Wachovia would credit Majapara's account for those checks on the same day.  Wachovia would then negotiate the check via the US Interbank Clearing System or other method.

11.      Majapara has endeavored to operate the highest quality business operations possible.  As such, in 2004 Majapara voluntarily subjected itself and its anti-money laundering processes to the scrutiny of outside auditors in order to obtain ISO 9001 certification.  Majapara had an independent accreditation organization conduct an audit of those processes for effectiveness and conformance to the rigorous standards of ISO 9001:2000.  As a result of this audit, Majapara obtained the ISO 9001 certification.

**Majapara's Course of Dealing with Wachovia**

12.      Majapara had a longstanding business relationship with Wachovia going back more than ten years.  In addition to Wachovia's longstanding practice of providing a day or two of float to Majapara in connection with FX transactions, Wachovia also provided Majapara with

operating lines of credit, overdraft privileges, and the ability to process unlimited remittances. These "operating facilities" had been in place for many years.

13.    While these operating facilities were not memorialized in writing, Wachovia knew that Majapara was dependent upon them and that terminating them without notice would be damaging to Majapara's business.

14.    In February 2007, Wachovia induced Majapara to transfer to Wachovia certain business that it had previously been doing with Harris Bank.  At that time, Majapara cleared remittances through Harris Bank as well as Wachovia.  Wachovia sought to earn the fees that Majapara had previously been paying to Harris Bank for its clearing services.  Thus, Wachovia sought a meeting with Majapara in Mexico City at which Wachovia representatives requested that Majapara transfer the Harris Bank clearing business to Wachovia.  Majapara agreed.  Over the next few months, Majapara transferred to Wachovia virtually all of the business it had been doing with Harris Bank.

15.    Majapara would never have agreed to Wachovia's request if it believed that Wachovia could give Majapara absolutely no advance notice that it was terminating Majapara's operating facilities.  Majapara reasonably believed that Wachovia was obligated to provide such notice by their longstanding course of dealing.

**Wachovia's Reaction to Bad Publicity**

16.    Some time later, Wachovia was the subject of embarrassing press reports that it had been doing business with certain businesses engaged in laundering the proceeds of the illegal drug trade.  A November 15, 2007 Forbes article, entitled "Banking on Drugs," reported that a Wachovia customer, Casa de Cambio Puebla ("Puebla") was linked to a business jet carrying tons of cocaine that crashed in September in Mexico.  Puebla also was linked to the purchase of

another plane carrying tons of cocaine that was seized by Mexican officials a year earlier. Puebla is not related in any way to Majapara.

17.     Upon information and belief, Wachovia decided to cease doing business with businesses outside the U.S. as a reaction to embarrassing press reports of Wachovia's dealings with Puebla.

**Wachovia Terminates Majapara Without Cause and  Without Notice**

18.     Late in the day on December 5, 2007, Majapara was visited by Carlos Perez and Juanita Gomez of Wachovia who hand delivered a letter informing Majapara that Wachovia's operating facilities were terminated.  These operating facilities were being terminated without cause.  As the letter from Carlos Perez stated:

> [a]s part of the ongoing review and re-evaluation of our long-term global strategy, Wachovia Bank, National Association ("Wachovia") has determined to cease providing correspondent banking services to exchange companies outside the United States. . . . Wachovia and I wish to thank you for your loyalty during our business relationship and wish you continued commercial success.

(attached hereto as Exhibit A)  The letter then informed Majapara that "your existing credit lines with Wachovia have been cancelled.  Any current outstanding utilized credit will remain in place until it has come to maturity."  In case there was any doubt, Mr. Perez made it clear – Majapara's operating facilities were terminated effective immediately.  Majapara pleaded with Mr. Perez to continue its operating facilities for a short time in order to give Majapara time to arrange for a substitute bank, but he refused.

**After Termination, Majapara Scrambles to Deal With
Dire Situation, Yet Pays Almost $40 Million to Wachovia**

19.     In an effort to deal with this situation, Majapara began contacting other banks

seeking a substitute for the operating facilities that Wachovia had just terminated.  Majapara also approached other foreign exchange bureaus seeking to negotiate operating alliances or the sale of lines of Majapara's business.

20.    Not surprisingly, Majapara rapidly began experiencing liquidity problems that continued to worsen over the next few days.  Despite the fact that Wachovia had caused Majapara's liquidity problems, Majapara paid to Wachovia almost $40 million to settle FX transactions the day after receiving this devastating news.

21.    Despite its best efforts, Majapara lacked sufficient funds to be able to settle the approximately $38 million in FX transactions that Wachovia had entered into with Majapara on December 5 – before Wachovia delivered its devastating news.  At the time Majapara entered into those transactions, Majapara had no idea that Wachovia was going to terminate its operating facilities later that day.  At the time Wachovia accepted Majapara's orders for these transactions, however, Wachovia would have known this.

22.    Over the next few days, Majapara continued trying to line up a substitute for Wachovia.  Banks that Majapara approached required time to obtain information about Majapara in order to present the information to the bank credit committees and otherwise obtain necessary approvals.  Majapara contacted other Mexican foreign exchange bureaus in an effort to enter into operating alliances or to sell them certain lines of business.

23.    On December 13, Majapara's CEO, Jorge Ortiz Muñoz telephoned Wachovia's Carlos Perez to again ask him to continue Majapara's operating facilities until the company could make substitute arrangements.  Mr. Ortiz informed Mr. Perez that Majapara was doing everything possible to pay Wachovia, but that Majapara was having difficulty dealing with the abrupt cancellation of its longstanding operating facilities.  Mr. Ortiz informed Mr. Perez that

reasonable notice would have enabled Majapara to replace Wachovia's operating facilities with another bank. Finally, Mr. Ortiz offered to provide Wachovia with security for the debt. Mr. Perez did not agree. Mr. Ortiz summarized his conversation with Mr. Perez in a December 13 letter that he sent to Mr. Perez. (attached hereto as Exhibit B)

**Wachovia's Misrepresentations to the Courts**

24.	The next day, December 14, Wachovia filed an action in the U.S. District Court for the Southern District of New York ("New York District Court") seeking emergency *ex parte* prejudgment relief including an attachment of Majapara's bank accounts and an injunction. Wachovia simultaneously filed an action in Circuit Court of Cook County, Illinois ("Illinois state court") seeking an *ex parte* attachment (attached as Exhibit C).

25.	In order to obtain relief from the New York District Court, Wachovia submitted a complaint (attached as Exhibit D), memorandum of law (attached as Exhibit E), and sworn declarations of Wachovia's Carlos Perez and attorney Scott McKessy (attached as Exhibit F and G, respectively). On the basis of those submissions, the Court entered the December 14 Order to Show Cause, which included an injunction against Majapara. (attached as Exhibit H)

26.	In the Declaration of Mr. McKessy filed by Wachovia with the Court, Mr. McKessy stated under oath that expedited *ex parte* relief was being sought "because of the likelihood that, if notified of the instant application before hand, defendant Majapara Casa De Cambio S.A. de C.V. ("Majapara") will dissipate or transfer assets which are the subject of this application." Mr. McKessy also stated under oath that Majapara had "absconded with over $38 million" of Wachovia's funds and had made a "threat" to make itself judgment proof and frustrate any attempt by Wachovia to collect.

27.    Mr. McKessy's declaration failed to disclose to the Court that Wachovia had without cause and without notice terminated Majapara operating facilities.  His declaration failed to disclose the almost $40 million that Majapara paid to Wachovia on December 6 – the day after Majapara's operating facilities were terminated.  These are material facts of which Mr. McKessy knew or reasonably should have ascertained before filing Wachovia's request for emergency relief and should have disclosed these facts to the Court in his declaration.

28.    In the Declaration of Mr. Perez that Wachovia filed with the Court, Mr. Perez stated under oath that Majapara had reneged on its transactions and "absconded with Wachovia's money."  Mr. Perez stated under oath that Majapara knew of its liquidity crisis before the closing of the December 5 FX transactions.  Mr. Perez stated that Majapara had "engaged in illegal loans in relation to its foreign exchange transactions."  Finally, Mr. Perez stated that "based upon [his December 13] conversation [with Mr. Ortiz], it is my belief that Majapara engaged in fraud…."

29.    Mr. Perez's declaration failed to disclose to the Court the reason Majapara had not been able to pay Wachovia on time – that Wachovia *caused* Majapara's liquidity crisis by terminating its operating facilities without cause and without advance notice *after* Majapara had placed the December 5 FX transactions.  Mr. Perez's declaration failed to disclose to the Court that the day after getting this devastating news, Majapara paid to Wachovia almost $40 million.  These are material facts of which Mr. Perez knew or reasonably should have known and should have disclosed to the Court in his declaration.

30.    After years of doing business with Majapara, Mr. Perez knew or reasonably should have known that Majapara was not engaged in any illegality.  Since Wachovia had been providing millions of dollars of credit to Majapara for years, it is difficult to believe that Wachovia did not know Majapara's business.

31.    Wachovia's memorandum of law, upon which the Court expressly relied in entering its December 14 Order to Show Cause, misrepresented to the Court that Majapara had "caused itself" to go out of business.  Wachovia knew that it had terminated Majapara's operating facilities on December 5 without cause and without any advance notice.  Wachovia knew that months earlier it had induced Majapara to move even more of its business to Wachovia.  As a result, Wachovia knew or reasonably should have known that this statement simply was not true.

32.    Wachovia's memorandum of law contains additional materially misleading statements ostensibly made in order to induce the Court to enter the temporary restraining order it sought.  In its memorandum of law, Wachovia represented to the Court that Majapara had "already attempted to remove certain funds from its Wachovia accounts."  Wachovia knew or should have known that any transfers of funds into or out of Majapara's accounts were done in the ordinary course of Majapara's business.   Nevertheless, Wachovia made false and materially misleading statements to the Court in order to lead the Court to believe that Majapara was attempting to move assets beyond Wachovia's reach.  Moreover, Wachovia knew that it was not entitled to a TRO or preliminary injunction because an inability to collect a money judgment does not satisfy the requisite of irreparable harm.

33.    Wachovia's complaint is rife with misrepresentations and fails to disclose the material facts set forth above.  In the complaint, Wachovia accuses Majapara of fraud because **"at the time Majapara entered into the December 5, 2007 agreement, it knew it was illiquid and insolvent and incapable of performing its obligations under the parties' agreement."** (emphasis added) Wachovia could not have believed this to be true when it knew that the genesis of Majapara's liquidity crisis was Wachovia's termination of Majapara's operating facilities.

Therefore, Wachovia knew or reasonably should have known at the time it made this statement that it was not true.

34.    Thus Wachovia induced the Court to enter the Order to Show Cause providing that "Majapara, shall be and hereby is enjoined and restrained from transferring, selling, pledging, assigning or otherwise disposing of any of its assets."  (attached hereto as Exhibit H) The Order to Show Cause was based solely upon representations that Wachovia made to the Court.

35.    The Order of Attachment entered by the Court on December 20 was based upon the same materially false and misleading representations made by Wachovia to the Court in support of the Order to Show Cause and was entered without adequate notice to Majapara. (attached hereto as Exhibit I)

36.    Wachovia made substantially the same false and misleading representations to the Illinois state court in order to induce it to grant an order of attachment.  (attached hereto as Exhibit J)

**Wachovia Disseminates Orders**
**Obtained Through Misrepresentations to Courts**

37.    After Wachovia induced the New York District Court and the Illinois state court to enter Orders against Majapara that Wachovia knew or reasonably should have known were based upon false statements, Wachovia then embarked upon a course of disseminating those Orders to others.  Wachovia disseminated the New York District Court's Orders and the Orders of the Illinois state court along with other materials to banks including Harris Bank, Citibank, JP Morgan Chase, Deutsche Bank, Standard Chartered, Bayerische Hypo- und Vereins Bank AG, Wells Fargo, and the Royal Bank of Canada.  Because Wachovia obtained these Orders on the basis of sworn declarations and other statements that it knew or reasonably should have known

were false and misleading, Wachovia knew that it was not entitled to the Orders. Thus, Wachovia was not privileged to disseminate these Orders to the banks nor was the dissemination of the Orders done in furtherance of Wachovia's legitimate interests in pursuing its interests in litigation. Wachovia's dissemination of these Orders was wrongful and the severe damage such dissemination caused to Majapara's reputation and ability to continue as a foreign exchange bureau was in no way justified.

38. Upon information and belief, Wachovia repeated the misleading statements in the documents filed with the Court to other foreign exchange bureaus and banks in Mexico in order to interfere with Majapara's efforts to obtain alternative financing, to interfere with Majapara's efforts to enter into operating alliances with other foreign exchange businesses, and/or to interfere with Majapara's efforts to sell certain lines of business. Wachovia's interference was malicious, unlawful, and not undertaken for any legitimate purpose or to advance any legitimate interest of Wachovia. As a result of Wachovia's interference, banks and foreign exchange bureaus with whom Majapara had been negotiating abandoned all discussions with Majapara.

39. Upon information and belief, shortly after filing its cases, Wachovia made substantially the same false and misleading statements made in the documents filed with the Courts to banking regulators in Mexico, in order to induce the regulators to take action against Majapara.

40. Shortly after Wachovia initiated the New York District Court action and the Illinois state court action, the affidavit of Carlos Perez was published on an internet website. On February 13, 2008 another website reported facts from documents filed with the Court on February 11. Upon information and belief, Wachovia has excessively and impermissibly published these court filings. Upon information and belief Wachovia or others acting on its

behalf have made substantially the same false and misleading statements made in the documents filed with the Court to the media in order to induce the media to publish such statements.

## COUNT I
## Breach of Contract

41.    Majapara incorporates paragraphs 1 through 40 above as if fully set forth herein.

42.    As set forth above, for many years Wachovia and Majapara had a contractual relationship whereby Wachovia provided operating facilities to Majapara.  That contractual relationship is evidenced by the course of dealing between the parties over many years.

43.    Wachovia owed Majapara a contractual duty to provide Majapara with reasonable notice that Wachovia was terminating its operating facilities so that Majapara would have time to make substitute arrangements.

44.    Wachovia breached its contractual duty to Majapara by terminating the operating facilities without cause and without providing Majapara any advance notice whatsoever.

45.    Majapara suffered significant damages as a result of Wachovia's breach.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

## COUNT II
## Wrongful Injunction

46.    Majapara incorporates paragraphs 1 through 40 above as if fully set forth herein.

47.     On December 17, 2007, Wachovia obtained injunctive relief against JOM
Corporation of Illinois from the Illinois state court.  On December 14 and 20, 2007, Wachovia
obtained injunctive relief against Majapara from the New York District Court.   Because
Wachovia obtained these injunctions by making false and misleading statements to the Illinois
state court and the New York district court, it was never entitled to such injunctive relief.

48.     Wachovia knowingly or recklessly made false and misleading statements to the
Courts, including the following:

- Majapara engaged in fraud because "at the time Majapara entered into the December 5,
2007 agreement, it knew it was illiquid and insolvent and incapable of performing its
obligations under the parties' agreement;"

- Majapara engaged in fraud because it did not intend to repay Wachovia for the
December 5 FX transactions;

- Majapara engaged in fraud because Majapara was engaged in illegal and illicit lending
activities in violation of Mexican law;

- Majapara had tried to move funds from the account it had with Wachovia as part of an
effort to place its assets beyond the reach of Wachovia in order to frustrate Wachovia's
ability to collect on any judgment.

49.     Wachovia knew or reasonably should have known that these statements were
false and materially misleading because Wachovia knew facts to the contrary, including the
following:

- Wachovia caused Majapara's liquidity crisis by terminating Majapara's operating
facilities *after* Majapara had placed the December 5 FX transactions;

- Despite its abrupt termination by Wachovia, Majapara still paid Wachovia almost $40
million the very next day to settle FX transactions;

- Majapara was unable to settle the remaining $38 million of FX transactions because of
Wachovia's abrupt termination of Majapara's operating facilities;

- The purported "lending" that Majapara engaged in was authorized by Mexican law, and
Wachovia knew it because it was Wachovia who processed the millions of dollars of
remittances for Majapara every day.

50.    Thus, Wachovia knew or reasonably should have known that the statements made in paragraph 48 above were materially false and misleading.

51.    Wachovia made the false and misleading statements in paragraph 48 above in order to induce the Courts to grant Wachovia *ex parte* prejudgment relief, including attachment of Majapara's bank accounts and an injunction.  The Illinois state court and the New York District Court expressly relied upon Wachovia's false and misleading statements in deciding to enter orders granting prejudgment relief.

52.    Wachovia falsely represented to the Courts that it would suffer irreparable injury if the injunctions sought were not granted despite knowing that its claims for purely money damages was insufficient to satisfy this requirement.

53.    As a result, Wachovia knew or reasonably should have known that it was not entitled to the injunctive relief it obtained from the Illinois state court and the New York District Court.

54.    As a result, Majapara suffered severe damages.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory and punitive damages, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

## COUNT III
## <u>Wrongful Attachment</u>

55.    Majapara incorporates paragraphs 1 through 40 and 46 through 54 above as if fully set forth herein.

56.    Because Wachovia obtained these attachment orders by making false and misleading statements to the Illinois state court and the New York District Court, it was never entitled to such relief.  On December 14, Wachovia obtained an order of attachment from the Illinois state court. On December 20, 2007, Wachovia obtained an Order of Attachment from the New York District Court. As set forth in Count II above, Wachovia knowingly or recklessly made false and misleading statements to the Illinois state court and the New York District Court.

57.    Wachovia knew or reasonably should have known that these statements were false and materially misleading because Wachovia knew facts to the contrary, including those facts set forth in paragraph 49.

58.    Thus, Wachovia knew or reasonably should have known that the statements made in paragraph 48 above were materially false and misleading.

59.    Wachovia made the false and misleading statements in paragraph 48 above in order to induce the Illinois state court and the New York District Court to grant Wachovia *ex parte* prejudgment relief, including attachment of Majapara's bank accounts.  The Illinois state court and the New York District Court expressly relied upon Wachovia's false and misleading statements in deciding to enter orders granting prejudgment relief.

60.    As a result, Majapara suffered damages.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory and punitive damages, including interest as allowed by law;

c.    award Majapara its costs and fees as allowed by law; and

d.    award Majapara such other and further relief as the Court may deem just and proper.

## COUNT IV
## Tortious Interference with Contract

61.    Majapara incorporates paragraphs 1 through 40 above as if fully set forth herein.

62.    Wachovia knew that although Majapara had most of its business with Wachovia, it also had relationships and contracts with other banks and financial institutions. Moreover, Wachovia knew that Majapara had relationships and contracts with its customers in Mexico.

63.    On information and belief, Wachovia maliciously and for improper purposes made accusations that Majapara was engaged in fraud and theft.  On information and belief Wachovia made those false accusations to banks including Harris Bank, Citibank, JP Morgan Chase, Deutsche Bank, Standard Chartered, Bayerische Hypo- und Vereinsbank AG, Wells Fargo, and the Royal Bank of Canada.  On information and belief, Wachovia maliciously and for improper purposes made these false and misleading statements to customers of Majapara.

64.    As a result of Wachovia's wrongful interference, Majapara's relationship with its customers and with  banks with which it did business has been damaged.

WHEREFORE, Majapara respectfully requests that this Court:

a.    enter judgment in its favor;

b.    award Majapara compensatory and punitive damages, including interest as allowed by law;

c.        award Majapara its costs and fees as allowed by law; and

d.        award Majapara such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Majapara hereby demands trial by jury for all claims so triable as of right.

Dated:  February 14, 2008                        Respectfully submitted,
                                                 Casa de Cambio Majapara S.A. de C. V.

                                                 _____/s/ Celiza P. Bragança_____
                                                      One of Its Attorneys

Celiza P. Bragança
Thomas D. Brooks
Sperling & Slater, P.C.
55 W. Monroe
Suite 3200
Chicago, IL  60603
(312) 641-3200
 (312) 641-6492 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I, Celiza P. Bragança, an attorney, hereby certify that a true and correct copy of the foregoing **Answer and Counterclaims** has been served upon:

Barry S. Rosen
Michael D. Richman
Michael S. Leib
REED SMITH, LLP
10 S. Wacker Drive
Chicago, Illinois  60606-7507

By electronic case filing this 14th day of February, 2008.

___/s/ Celiza P. Bragança____